MARTIN, C.J., delivered the opinion of the court, in which BOGGS, J., joined. KENNEDY, J. (pp. 821-23), delivered a separate dissenting opinion.
BOYCE F. MARTIN, Jr., Chief Judge.
The Pension Benefit Guaranty Corporation appeals the district court’s order holding that less than the entire amount of the Hauser-man, Inc. Salaried Employees’ Retirement Income Trust and Plan’s claim for unpaid minimum funding contributions accruing post-petition was entitled to administrative priority. For the reasons set forth below, we affirm.
I.
In 1958, Hauserman, Inc. established the Hauserman, Inc. Salaried Employees’ Retirement Income Trust and Plan as a tax-qualified defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act. At all times relevant to this dispute, Hauserman was the contributing sponsor of the Plan within the meaning of 29 U.S.C. §§ 1301(a)(13) and 1362(a), and the administrator of the Plan within the meaning of 29 U.S.C. §§ 1002(16) and 1301(a)(1). As contributing sponsor, Hauserman made contributions to the Plan until October 15, 1989, when it failed to make a quarterly contribution. Thereafter, debtors Hauserman and Sunarhauserman, Inc. ceased contributing to the Plan, with the exception of a contribution of $26,233 made on December 14,1989.
The Plan’s fiscal year ran from July 1 to June 30. As of July 1,1989, the Plan provided benefits for approximately six hundred and eighty-nine participants: one hundred and ninety-four retired participants and beneficiaries receiving payments from the Plan; one hundred and sixty-two terminated, vested participants who would be entitled to benefits in the future; and three hundred and thirty-three active employee/participants who were continuing to accrue pension benefits.
On October 5,1989, the Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code. Shortly after the petition date, the Debtors moved the bankruptcy court for authorization to terminate the Plan in a distress termination pursuant to 29 U.S.C. § 1341(c). During bankruptcy, the Debtors amended the Plan, effective February 13, 1990, to freeze all further benefit accruals under the Plan. The Debtors and Pension Benefit subsequently entered into an agreement, effective April 1, 1990, which terminated the Plan pursuant to 29 U.S.C. §§ 1341 and 1342(c), fixed the Plan’s termination date at April 30, 1990, and appointed Pension Benefit as trustee of the Plan pursuant to 29 U.S.C. § 1342(b) and (c).
The Debtors continued to operate their business and employ a work force during bankruptcy, although several workforce reductions took place, ultimately decreasing the number of active employee/participants in the Plan from two-hundred sixty immediately prior to the October 5, 1989 commencement of the Debtors’ bankruptcy case to thirtyth-ree on February 17, 1990. On April 30, the Plan was formally terminated.
On July 16, 1990, Pension Benefit filed four proofs of claim against the Debtors relating to the Plan, only one of which is rele *814 vant to this appeal. That claim sought Chapter 11 administrative expense priority in the amount of $338,143.00 for unpaid post-petition minimum funding contributions accruing between October 5, 1989 and April 30, 1990, the date of the Plan’s termination. The Debtors filed general objections to Pension Benefit’s claims, disputing the amount and priority of each of the claims on various grounds. Pension Benefit subsequently filed a motion for summary judgment, which the Debtors opposed. The bankruptcy court heard argument on the motion for summary judgment on September 22, 1994. At the conclusion of the hearing, and at the request of the bankruptcy court, the parties submitted a supplemental stipulation indicating the amount of the “normal cost” and “non-normal cost” components of Pension Benefit’s administrative expense claim, as well as the “normal cost” component adjusted to take into account post-petition reductions in the Debtors’ workforce and the post-petition freeze of benefit accruals.[1]
On June 15, 1995, the bankruptcy court entered a Memorandum of Opinion and Order holding that the “non-normal cost” component of Pension Benefit’s claim was not entitled to administrative expense priority because it was based on an experience loss that was realized pre-petition. The bankruptcy court also adjusted the “normal cost” component of Pension Benefit’s administrative expense claim to reflect the post-petition decrease in the Debtors’ workforce and freeze of benefit accruals.
Accordingly, the bankruptcy court allowed Pension Benefit’s claim as an administrative expense under 11 U.S.C. § 503(b) in the amount of $67,612.00.[2] On June 27, 1995, Pension Benefit moved to amend the bankruptcy court’s order to clarify that “the portions of the Pension Benefit Guaranty Corporation’s claim that had been adjudged not to be a priority shall be allowed as general unsecured claims.” The bankruptcy court granted Pension Benefit’s motion and entered an amended order on July 5. Pension Benefit filed a timely notice of appeal on July 17.
The district court took the case on briefs without oral argument. On April 10, 1996, the district court affirmed the decision of the bankruptcy court, adopting the bankruptcy court’s Memorandum of Opinion and Order as its own. Pension Benefit timely appealed the district court’s decision to this Court on June 10, challenging only the lower court’s decision regarding the administrative expense claim.
n.
On appeal, Pension Benefit argues that the courts below improperly limited administrative expense priority to that portion of the post-petition minimum funding contribution claim attributable to pension benefits actually earned by employee/participants employed by the debtors during their post-petition operations.
Pension Benefit raises three principal objections to the district court’s order. First, it argues that the lower courts improperly applied the “benefit to the estate” test, which requires that a claim be based on consideration after the bankruptcy petition is filed in order to be entitled to administrative expense priority. Second, Pension Benefit asserts that it was error for the lower courts to allocate the Debtors’ minimum funding obligation to pre- and post-petition periods. Finally, Pension Benefit challenges the lower courts’ adjustment of the “normal cost” component of its claim to reflect post-petition workforce reductions and the freeze on benefit accruals. After reviewing the statutory provisions and actuarial principles relevant to an employer’s responsibility for funding its pension benefit plan, we will address each of these issues in turn.

*815
The Minimum Funding Standard and Actuarial Principles

An employer’s decision to establish a pension plan is entirely voluntary, but its incentives to do so include improved relations with employees and certain tax advantages. If a plan is “tax qualified” under the Internal Revenue Code, an employer may usually deduct contributions required to fund the promised benefits. 26 U.S.C. § 404 (1997). Funds contributed by an employer are generally held in trust and earn income on a tax-free basis. 29 U.S.C. § 1103 (1985); 26 U.S.C. §§ 401, 501 (1997). Under a defined benefit plan, the plan pays a fixed benefit from its assets to participants who meet the conditions specified in the written plan document.
Once an employer establishes a defined benefit plan, such as the Plan at issue in this case, it must fund the plan in accordance wdth the minimum funding standard imposed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1082 (1997), and the Internal Revenue Code, 26 U.S.C. § 412 (1997).[3] The minimum funding standard requires every employer maintaining a tax-qualified plan to fund the plan until it is terminated, in amounts determined by the plan’s enrolled actuary in accordance with ERISA and the Internal Revenue Code. The statutory rules impose both a minimum required contribution and a maximum amount that may be deducted annually. 29 U.S.C. § 1082; 26 U.S.C. §§ 404, 412.
The minimum funding rules require the plan sponsor to maintain a ledger account, termed the “funding standard account.” 29 U.S.C. § 1082(b)(1); 26 U.S.C. § 412(b)(1). The sponsor’s annual contribution must be sufficient to eliminate any “accumulated funding deficiency” in the plan’s funding standard account. 29 U.S.C. § 1082(a)(2); 26 U.S.C. § 412(a)(2). That is, the account must have a zero or positive balance “as of the end of [the] plan year.” 29 U.S.C. § 1082(a)(1); 26 U.S.C. § 412(a)(1). Although liability for the annual minimum funding contribution accrues over the course of the plan year, the resulting debt is required to be paid in quarterly installments. 29 U.S.C. § 1082(e); 26 U.S.C. § 412(m). Any remaining amount due for the plan year must be contributed no later than eight and one-half months after the close of the plan year to be considered a catch-up payment deemed to have been made on the last day of the plan year. 29 U.S.C. § 1082(c)(10); 26 U.S.C. § 412(e)(10).
As statutory trustee, Pension Benefit is empowered to collect on behalf of a plan any amount due, including any unpaid minimum funding contributions. 29 U.S.C. §§ 1342(d)(1)(B), 1362(c). Any recovery Pension Benefit realizes on a plan’s claim for contributions is deposited in a trust fund that holds the assets of all terminated plans for which Pension Benefit serves as statutory trustee. This recovery is used to pay a portion of the participants’ benefits. See 29 U.S.C. § 1344(a).
Plans are valued and any accumulated funding deficiency determined in accordance with an actuarial cost method. 29 U.S.C. § 1082(c); 26 U.S.C. § 412(c). An actuarial cost method is a technique for determining the annual amount of a pension plan’s benefits and expenses. 29 U.S.C. § 1002(31). Under ERISA, a plan may use any one of six acceptable cost methods. 29 U.S.C. §§ 1002(31), 1082(e)(1); 26 U.S.C. § 412(c)(1). In this case, the Plan uses the “unit credit” method. While each of the six cost methods, if properly employed, will meet ERISA’s minimum funding standards, each cost method is based on different actuarial assumptions and different funding objectives. Depending on the method used, the costs assigned to any given year, and thus the funding amount necessary to meet the minimum funding standard for the year, will also differ. Consequently, an employer must consider many factors in selecting an actuarial cost method, including whether the method creates an annual cost that is a level percentage of payroll over the years, and whether the method is sufficiently flexible to meet the employer’s short-term fiscal needs.
The annual contribution calculated by the actuary is generally composed of “normal cost” and, under some cost methods, “actuar *816 ial accrued liability.” A pension plan’s “normal cost” is the annual cost of future pension benefits and administrative expenses assigned, under an actuarial cost method, to years subsequent to a particular valuation date of a pension plan. 29 U.S.C. § 1002(28). A pension plan’s “actuarial accrued liability,” or, in the terminology of the Bankruptcy Code, its “non-normal cost,” refers simply to that portion of a plan’s annual cost that is not “normal cost.” See 29 U.S.C. § 1002(29). More specifically, “actuarial accrued liability,” or “non-normal cost,” comprises seven statutory charges that may affect a pension plan’s funding standard account, depending on which cost method the plan uses. See 29 U.S.C. § 1082(b)(2); 26 U.S.C. § 412(b)(2). All six acceptable actuarial cost methods have a normal cost component. However, only four of the acceptable cost methods recognize an actuarial accrued liability, or non-normal cost, component, and those that do differ in their treatment of the particular charges that constitute actuarial accrued liability. Under the aggregate cost method, for example, all costs of the plan constitute the plan’s normal cost.
III.

The Test for Determining Administrative Priority

The Bankruptcy Code grants priority to certain administrative expenses, such as “the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.” 11 U.S.C. §§ 503(b)(1)(A); see 507(a)(1) (1993). The district court, in adopting the bankruptcy court’s decision, refused to grant administrative expense priority to any part of the non-normal cost component of Pension Benefit’s claim because it found that this non-normal component, which consisted almost entirely of an experience loss,[4] was wholly attributable to pre-petition liabilities. The court reached this conclusion by applying the well-accepted “benefit to the estate” test, which states that a debt qualifies as an “actual, necessary” administrative expense only if (1) it arose from a transaction with the bankruptcy estate and.(2) directly and substantially benefitted the estate. Employee Transfer Corp. v. Grigsby (In re White Motor Corp.), 831 F.2d 106, 110 (6th Cir.1987) (citing In re Mammoth Mart, Inc., 536 F.2d 950 (1st Cir.1976) and Matter of Jartran, Inc., 732 F.2d 584 (7th Cir.1984)). The benefit to the estate test limits administrative claims to those where the consideration for the claim was received during the post-petition period. Thus, the district court granted administrative priority only to that portion of Pension Benefit’s claim that related to benefits earned by employees during the post-petition period, on the theory that the Debtors’ estate was benefitted only to the extent that employees continued to work during bankruptcy proceedings.
Pension Benefit asserts that the lower courts erred in applying the benefit to the estate test to determine the administrative priority of its claim. According to Pension Benefit, the lower courts should have followed the reasoning of Reading Co. v. Brown, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), and its progeny, which have upheld creditors’ assertions of administrative priority in the absence of a meaningful post-petition benefit to the estate. In Reading, for example, the Supreme Court held that considerations of fundamental fairness and logic required the allowance of a claim of administrative priority for damages resulting from the post-petition negligence of a receiver because such damages were “actual and necessary” costs of administration. The Court explained that “actual and necessary costs” should “include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible.” Id. at 483, 88 S.Ct. at 1766. The Court reasoned that its decision allocates the burden of the tort damages arising from the operation of the debtor post-petition to the pre-petition creditors, who are the intended beneficiaries of the debtor’s rehabilitation. Id. at 482-83, 88 S.Ct. at 1765-66.
*817 Pénsion Benefit argues that under the Reading analysis, its entire claim for minimum funding contributions attributable to the post-petition period would qualify as an administrative expense, because the entire amount of this claim represents a “cost ordinarily incident to the operation of [its] business” — funding an employee benefit plan. While it is true that the Reading line of cases has created an exception to the benefit to the estate requirement for claims for costs ordinarily incident to the operation of a business, we are not convinced that Pension Benefit can, on the facts of this case, take advantage of the Reading analysis.
Reading cannot assist Pension Benefit here because of key differences in that case and the facts of the present dispute. To be sure, the Reading rationale allows administrative expense priority in the absence of a post-petition benefit to the estate. However, even in Reading and cases following it, the debt at issue arose post-petition. Here, in contrast, much of Pension Benefit’s claim — in particular, the' non-normal cost component— relates to debts that arose pre-petition. As our opinion today makes clear, it is an absolute requirement for administrative expense priority that the liability at issue arise, post-petition. See infra.
Reading does not eliminate the requirement that a debt arise post-petition in order to be accorded administrative expense priority. In this ease, the non-normal cost component of Pension Benefit’s claim relates to a pre-petition liability. Thus, even if Reading were otherwise applicable, it would not justify granting administrative expense priority to the entirety of Pension Benefit’s claim. We therefore agree with the district court’s holding that, under the benefit to the estate test, none of the non-normal cost portion of Pension Benefit’s minimum funding contribution claim is entitled to administrative expense status.

Allocation of the Claim to Pre- and Post-Petition Periods

Pension Benefit next argues that the lower courts’ allocation of its minimum funding contribution claim to pre-and post-petition periods — and their accompanying denial of priority for the pre-petition, non-normal cost component — is inconsistent with ERISA, actuarial practice, and the Bankruptcy Code.
First, Pension Benefit asserts that in making administrative expense decisions, the court must look to the substantive law giving rise to a. claim — in this ease, ERISA — to determine the nature of the claim, as well as when the claim arose. See Grogan v. Garner, 498 U.S. 279, 283, 284 n. 9, 111 S.Ct. 654, 657, 657-58 n. 9, 112 L.Ed.2d 755 (1991) (“The validity of a creditor’s claim is determined by rules of state law.... We use the term ‘state law1 expansively herein to refer to all nonbankruptcy law that creates substantive claims. We thus mean to include in this term claims that have their source in substantive federal law, such as federal securities law or other federal antifraud laws.”) (citation omitted); In re Nat’l Gypsum Co., 139 B.R. 397, 405 (N.D.Tex.1992) (explaining that whether a claim is pre- or post-petition depends on when the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation — a ‘right to payment’ — under the relevant non-bankruptcy law). Following these principles, Pension Benefit points out that under ERISA, debtors are liable to the plan for a singular amount — the entire accumulated funding deficiency accruing during the priority (i.e., post-petition) period. Nowhere does ERISA permit an employer to segregate the charges to the funding standard account that accrue during the plan year for purposes of allocating its liability to the pension plan. See Treas. Reg. §§ 1.412(c)(1), 1.412(c)(3)-1(c)(1). Moreover, asserts Pension Benefit, ERISA clearly defines when its claim arose: for each plan year, the employer must contribute the amount necessary to eliminate an “accumulated funding deficiency” in the plan’s funding standard account as of the end of the plan year. 29 U.S.C. §§ 1082(a), 1362(c). This singular amount is computed as the difference between the total charges and total credits to the funding standard account, 29 U.S.C. § 1082(a)(2), and the liability for the entire amount — the “right to payment”— arises at the end of the plan year. In this case, then, the Debtors became bound to *818 eliminate the accumulated funding deficiency — both the normal and non-normal cost components — as of June 30, 1990, the end of the 1989-90 plan year.[5] Because this was during the administration of the estate, arguably Pension Benefit’s entire claim arose post-petition and is therefore entitled to administrative expense status.
Pension Benefit also asserts that the bankruptcy court used a legal standard based wholly on actuarial methodologies to determine the priority of the minimum funding contribution claim. That court allegedly presumed that normal cost, when reduced by declines in workforce and the freezing of benefit accruals, correlates with benefits “earned” during any given time period, and conversely, that non-normal cost correlates with benefits “earned” or experience losses “realized” before that period. Pension Benefit challenges this presumption on the ground that such correlations do not always hold true. In five of the six actuarial cost methods authorized by ERISA, the normal cost for any given year does not correlate with the benefits “earned” for that year. Similarly, while all six cost methods have a normal cost component, only four have a non-normal cost component, and each uses a different method for calculating this liability. In the methods that do not have a non-normal cost component, all costs of the plan are normal cost.
Thus, claims Pension Benefit, if an employer enters bankruptcy, maintains a workforce, and uses one of the five actuarial methods under which normal cost does not correlate with benefits “earned” during a given period, there will be no rational basis under the bankruptcy court’s decision for determining whether Pension Benefit’s claim will be accorded administrative priority. The implications of such a legal standard on the pension insurance program and on pension plan funding are, according to Pension Benefit, enormous. In Pension Benefit’s view, the bankruptcy court’s standard will lead to arbitrary and inconsistent results based solely on the actuarial cost method chosen by the employer. Equally important, asserts Pension Benefit, the bankruptcy court’s decision encourages employers who are in dire financial straights to selectively fund their pension plans based on the actuarial cost method that will yield the lowest priority claim should bankruptcy ensue. According to Pension Benefit, the only way to resolve these difficulties is for this Court to accord priority to the full amount of the contribution — bath normal and non-normal cost components— that accrues post-petition.
We are not unmindful of Pension Benefit’s concerns, but they are, however, somewhat overstated. It is well established that the Bankruptcy Code, not ERISA, determines the priority of claims against a bankrupt estate. United States v. Embassy Restaurant, Inc., 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959) (‘We construe the priority section of the Bankruptcy Act, not these statutes. It specifically fixes the priority of claims of classes of creditors.”). Thus, regardless of the substantive law on which the claim is based, the proper standard for determining that claim’s administrative priority looks to when the acts giving rise to a liability took place, not when they accrued. Jar-tran, for example, a leading decision from the Seventh Circuit, involved a claim by an advertising agency and a company that arranged for a' debtor’s ads to appear in telephone directories. Applying the two-part benefit to the estate test, the court held that the claim, for the amount owing for ads published post-petition, was not entitled to administrative priority because the debtor committed to placing the ads before filing for bankruptcy. Jartran, 732 F.2d 584. The Jartran court based this finding on its conclusion that the creditors’ claim arose pre-petition because “the agreement among the parties was entered into, and the ads were placed without possibility of revocation, before the petition was filed.” Id. at 587. That the ads were published post-petition, and that the actual payment was made post-petition, was irrelevant to determining when the claim arose for purposes of § 503(b)(1)(A) *819 priority. Instead, the court focused on when the commitment to place and pay for the ads occurred. In so doing, the Jartran court emphasized that the purpose of § 503 is to grant priority only to the claims of those entities who are induced to do business with the debtor post-petition. Such claims receive priority because they enable the estate to continue for the benefit of existing creditors. Id. at 587, 588.
Similarly, in In re Mammoth Mart, Inc., 536 F.2d 950 (1st Cir.1976), the First Circuit denied administrative expense priority for former employees’ severance pay claims on the ground that such claims were based entirely upon services employees performed prior to bankruptcy filing. Id. at 955. In so holding, the court made clear that “[i]t is only when the debtor-in-possession’s actions themselves — that is, considered apart from any obligation of the debtor — give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration.” Id. For purposes of administrative priority, the court therefore held that the employees’ claims arose pre-petition, even though they were due and payable post-petition. As the court explained, “It is established that a debt is not entitled to priority as a cost and expense of administration simply because the claimant’s right to payment arises after the debtor-in-possession has taken some action.” Id. at 955.
Applying the principles set forth in Jar-tran and Mammoth Mart to the facts of the present case, it is clear that the non-normal cost component of Pension Benefit’s claim, because it relates to the Debtors’ actions prior to filing for bankruptcy, arose pre-petition, and therefore is not entitled to administrative priority under § 503(b)(1)(A).
In reaching this decision, we have carefully considered Pension Benefit’s warnings of “arbitrary and inconsistent” results. However, we do not believe that the standard we adopt today will lead to such problems. Contrary to Pension Benefit’s contentions, we do not read the bankruptcy court’s opinion as holding that normal costs are always to be considered post-petition expenses, while non-normal costs are always to be considered pre-petition expenses. Rather, we view the bankruptcy court’s standard as focusing on whether the acts giving rise to a particular liability occurred pre- or post-petition. Here, it happens that the bulk of the non-normal cost component is based on an experience loss from a pre-petition event, while the normal cost component relates to benefits earned post-petition. Despite Pension Benefit’s concerns, future courts applying this standard will not reach varying results based merely on the happenstance of the debtor’s chosen actuarial method. The standard we adopt today looks beyond the actuarial labels used by the debtor to determine when the events giving rise to particular costs occurred.
We therefore hold that the lower courts did not err in dividing Pension Benefit’s claim into pre- and post-petition components. The bankruptcy court properly found that the non-normal cost component, which consisted of an experience loss realized in the prior plan year, was a liability that arose pre-petition, while the normal cost component, to the extent it consisted of benefits earned after the Debtors entered bankruptcy, was a liability that arose post-petition. The latter was therefore entitled to administrative priority, while the former was not.

Adjustment of Claim for Workforce Reduction and Freeze of Benefit Accruals

Pension Benefit’s last major objection concerns the lower courts’ reduction of the normal cost portion of Pension Benefit’s claim to reflect post-petition reductions in workforce and the freezing of benefit accruals under the Plan. According to Pension Benefit, these reductions contravened valid Treasury Regulations, which require the actuarial cost method and assumptions used by a pension plan to be “reasonable.” 26 U.S.C. § 412(c)(2)(A), (3)(A). Treasury Regulation § 1.412(c)(3) — !(b)(3) specifically states that a “reasonable funding method” includes three classes of individuals: (1) participants currently employed, (2) former participants who either terminated or retired under the plan, and (3) all other persons currently entitled to benefits under the plan. While this rule carves out an exception for certain recently- *820 hired participants, see 26 C.F.R. § 1.412(c)(3)-(1)(c)(3)(ii), nowhere does it make an exception for participants terminated by the employer during the plan year. Thus, Pension Benefit asks this court to reverse the bankruptcy court’s adjustment of its claim for reductions in the Debtors’ workforce because that adjustment, in its view, violated a validly promulgated Treasury Regulation.
Pension Benefit also claims that Treasury Regulations provide that “a reasonable funding method does not anticipate changes in plan benefits ... that become effective after the first day of, but during, a current plan year.” 26 C.F.R. § 1.412(c)(3)-1(d)(1). Because “changes in plan benefits” would include a freeze of benefit accruals under the Plan, Pension Benefit asserts that the bankruptcy court erred in limiting the Plan’s normal cost component to the period until benefit accruals were frozen.
Basically, Pension Benefit is arguing that because the Debtors were bound by ERISA and Treasury Regulations to fund the Plan fully after bankruptcy, regardless of workforce reductions or a freeze in benefit accruals, all such expenses are entitled to priority as actual and necessary costs of preserving the estate. This argument is not without some merit. Pension Benefit’s two earlier claims on this appeal were resolvable by direct reference to the Bankruptcy Code. Section 503’s actual and necessary test dictates whether administrative priority applies, as well as when priority applies. The code does not, however, define exactly what proportion of post-petition expenses are considered “actual and necessary”; in other words, it does not specifically define how much of a post-petition claim deserves administrative priority. Pension Benefit urges us to look to ERISA and Treasury Regulations to define this amount, while the Debtors argue that the only logical interpretation of “actual and necessary” is benefits related to hours actually worked post-petition.
We agree with Pension Benefit- that the Debtors were technically bound by ERISA and Treasury Regulations to fully fund the Plan until termination regardless of workforce reductions or a benefit freeze. • However, we do not accept Pension Benefit’s conclusion that the full costs of funding the Plan post-petition were therefore “actual and necessary” costs entitled to administrative priority. Rather, in the context of the Debtors’ bankruptcy filing and ultimate termination of the Plan, it seems more appropriate to view as “actual and necessary” only that portion of the Debtors’ post-petition funding obligation that can be tied to employees’ actual post-petition services — i.e., hours actually worked by employees post-filing. Such an interpretation of “actual and necessary’’ is more in keeping with existing decisions construing the Bankruptcy Code, which focus on actual post-petition services to a debtor in determining questions of administrative priority. See, e.g., Mammoth Mart, 536 F.2d at 955 (denying administrative priority for employees’ severance pay claims on the ground that such claims were based on services employees performed prior to debtor’s filing for bankruptcy).
The actuarial goals established by ERISA and related Treasury Regulations support our decision. ERISA’s minimum funding standard computes present funding obligations on the basis of past experience and projections. The statute contemplates that present changes will be reflected in future projections. In this case, the workforce reductions and freeze in benefit accruals would affect future actuarial analyses, reducing funding obligations in the coming Plan year. However, as the bankruptcy court explained, ‘Where, as here ... the debtor takes steps to terminate the plan soon after the ease is filed, the postpetition changes in employment will never be reflected.” While it may make sense in the context of an ongoing plan to decide what portion of post-petition expenses are “actual and necessary” by looking to ERISA’s actuarial principles, it makes little sense in the present situation, where the Plan has been terminated and there are no future Plan years in which the workforce reductions and freeze in benefit accruals will be reflected.
• Pension Benefit disputes the conclusion that post-petition changes in employment will never be reflected. It argues that workforce reductions will cause the actual experience of *821 the Plan to vary from the anticipated experience of the Plan, resulting in an experience gain which would normally be taken into account at the next actuarial valuation. Although Pension Benefit recognizes that there will be no actuarial valuation because of the Plan’s termination, it contends that the experience gain resulting from the Debtors’ workforce reduction that would have been recognized in the coming year is not foregone because the contribution — the seeming “overpayment” of normal cost — is being made to an underfunded plan, and will be reflected as a Plan asset that reduces the underfunding of the Plan dollar-for-dollar.
This argument ignores the fact that the Debtors would be required to pay for pension benefits which were never earned prior to paying any of their general unsecured creditors. Further, the Debtors would be paying for such benefits with administrative expense dollars which would be used to reduce the Debtors’ pre-petition, general unsecured indebtedness to Pension Benefit. Such a result would be grossly inequitable to the Debtors’ other general unsecured creditors. Because we find that the amounts due the Plan under existing Treasury Regulations do not relate to actual hours worked post-petition, or even to actual accruals of benefits, we hold that it is inappropriate to grant administrative priority status to the entire amount due the Plan post-petition. Instead, we affirm the lower courts’ holding that administrative priority applies only to the post-petition normal cost component of Pension Benefit’s claim, adjusted for workforce reductions and the freeze in benefit accruals.
IY.
For the reasons set forth above, we AFFIRM the decision of the district court.

. The parties stipulated that the non-normal cost component of Pension Benefit’s claim was $142,-228.00, the normal cost component was $195,-915.00, and the normal cost component, adjusted for workforce reductions and the freeze in benefit accruals, was $67,612.00.

. As noted above, the parties stipulated that the normal cost component of Pension Benefit’s claim, adjusted for workforce reductions and the freeze in benefit accruals, was $67,612.00.

. These are parallel provisions.

. An "experience loss” is the result of the actual experience of the plan being financially less favorable than had been assumed in the actuarial calculations in prior years.

. In the year that a plan terminates, Rev. Rul. 79-237, 1979-2 C.B. 190, requires the employer to maintain the funding standard account until the end of the plan year, but the charges and credits are ratably adjusted to the date of plan termination.