In re COMMERCIAL FINANCIAL SERVICES, INC., and CF/SPC NGU, Inc., Debtors.

Bankruptcy Nos. 98–05162–R, 98–05166–R.

United States Bankruptcy Court, N.D. Oklahoma.

May 6, 1999.

Larry M. Wolfson, Jenner & Block, Chicago, IL, Neal Tomlins, Tomlins & Goins, Tulsa, OK, for debtor.

Gregory T. Colpitts, Magee & Colpitts, Tulsa, Oklahoma, for John Bachman, Bruce Phelps.

Ronald C. Kaufman, Tulsa, OK, for Carol Spangler.

Katherine Vance, Assistant U.S. Trustee, Tulsa, OK.

### ORDER DENYING MOTIONS TO CLASSIFY CLAIMS AS ADMINISTRATIVE PRIORITY EXPENSES
(Spangler, Phelps, Bachman)

DANA L. RASURE, Chief Judge.

Before the Court are the (1) Motion to Classify Claim as an Administrative Priority Expense Under Section 503(b)(1)(A) and Brief in Support filed by Carol Spangler ("Spangler") on February 22, 1999; (2) Request of Bruce Phelps for Payment of Administrative Expense and Brief in Support filed by Bruce Phelps ("Phelps") on March 5, 1999; and (3) Request of John Bachman for Payment of Administrative Expense and Brief in Support filed by John Bachman ("Bachman") on March 5, 1999 (collectively the "Motions"). Spangler, Phelps and Bachman are collectively referred to herein as the "Movants." The Debtor, Commercial Financial Services, Inc. ("CFS"), filed its objection to the Spangler request on March 10, 1999, and its objection to the Phelps and Bachman requests on March 22, 1999. At the request of Phelps and Bachman, a hearing on the Phelps and Bachman Motions was held on May 4, 1999, wherein counsel for the parties presented argument and the

employment agreements of Phelps and Bachman were admitted into evidence by stipulation. No hearing was requested in the Spangler matter and the Court finds that it may decide that matter upon the pleadings as a matter of law.

Based upon the Motions, attachments thereto, the exhibits admitted, the arguments of counsel and the relevant law, the Court finds and concludes as follows:

**Jurisdiction.**

The Court has jurisdiction of these matters pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 1334(a).

**Findings of fact.**

Each of the Movants is a former employee of CFS. Each of the Movants had entered into a pre-petition negotiated written employment agreement with CFS which had not yet expired at the time that CFS filed its voluntary petition for relief on December 11, 1998. With respect to the Bachman and Phelps agreements, CFS had agreed to pay Bachman and Phelps a lump sum cash payment equal to their respective annual base salaries ($120,000 and $150,000, respectively) upon termination of employment prior to the expiration of the contract term for any reason other than "cause," as the term "cause" was defined in the agreement. With respect to the Spangler agreement, Spangler was an "at will" employee, but CFS agreed that in the event CFS terminated Spangler for a reason other than cause, CFS would give Spangler six months' notice or, in the alternative, forego notice and pay Spangler a lump sum equal to six months of her annual base salary, which was $155,000 at the time of termination. Collectively, these contract provisions are hereinafter referred to as the "Lump Sum Termination Payment Clauses."

Under Sections 1106 and 1107 of the Bankruptcy Code, CFS, as debtor in possession, has continued to operate its business of collecting bad credit card debt either for its own benefit or as a servicer for entities that hold portfolios of bad credit card debt as security for asset-backed securities. Each Movant was terminated less than one month after the commencement of this case, and each Movant was terminated pursuant to a company-wide reduction in force in which CFS's workforce of approximately 3,800 employees was halved for economic reasons. Thus, Bachman and Phelps were terminated prior to the expiration of their contract terms. Spangler was terminated without six months' notice. For the purposes of this Order, the Court assumes that each of the Movants was terminated for a reason other than cause. Following the terminations, CFS rejected the Movants' employment agreements with this Court's approval pursuant to 11 U.S.C. § 365(a). *See* Order Approving Rejection of Employment Contracts (Bachman & Phelps) dated February 19, 1999, and Agreed Order Approving Rejection of Employment Contract (Spangler) dated March 11, 1999.

The Movants assert claims under the Lump Sum Termination Payment Clauses and contend that such claims are priority administrative claims under 11 U.S.C. § 503(b)(1)(A). The Movants cite to *Isaac v. Temex Energy, Inc. (In re Amarex, Inc.)*, 853 F.2d 1526 (10th Cir.1988) (hereinafter "*Amarex*"), in support of their contention that the lump sum payments they seek are severance pay claims and as such are entitled to administrative priority under Section 503(b)(1)(A) of the Bankruptcy Code. CFS objects to classifying Movants' claims as administrative claims.

**Conclusions of law.**

█ The burden of proving priority of a claim is on the party claiming priority—in this case, the Movants. *See Amarex*, 853 F.2d at 1530. The Movants' employment agreements are unambiguous regarding the Lump Sum Termination Payment Clauses, and therefore no extrinsic evidence is necessary or permitted to explain the purpose of the clauses. *See Amarex*, 853 F.2d at 1530.

Under Section 507(a)(1) of the Bankruptcy Code, administrative expense

claims allowed under Section 503(b) of the Bankruptcy Code are entitled to first priority in distribution. Section 503(b) of the Bankruptcy Code delineates the spectrum of administrative expenses. The Movants contend that their claims fall within subsection (1)(A) of Section 503(b) as "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A).

It is difficult, even under an expansive reading of Section 503(b)(1)(A), to categorize the Movants' claims for lump sum payments equal to annual or semi-annual salaries for unperformed services as "necessary costs and expenses of preserving the estate." The Movants do not allege that the services they rendered for the debtor-in-possession over the three weeks between commencement of the case and the termination of the Movants were necessary to the preservation of the estate. The Court takes judicial notice of evidence presented in prior proceedings which demonstrated that the reduction-in-force under which the Movants were terminated was an essential part of a plan to reduce CFS's operating expenses to a level wherein the cost of collecting or servicing accounts was at least equal to, if not less than, the revenues collected. In that environment of financial austerity, paying the Movants their annual or semi-annual salaries without receiving any services beneficial to the estate is contrary to the notion of "*preserving* the estate."

Nor do the Movants allege that the services they rendered during the three week post-petition period merit compensation in the amount of the lump sum claims. Further, there is no evidence that the Movants were not paid in full for the post-petition services actually rendered. Their claims for termination pay are clearly not for "wages, salaries, or commissions for *services rendered* after the commencement of

the estate." *See* 11 U.S.C. § 503(b)(1)(A) (emphasis added).

The Movants, however, urge the Court to look to case law interpreting Section 503(b)(1)(A), and in particular to the *Amarex* case cited above. Notwithstanding that the statute seems crystal clear in its meaning and its application to the Movants' circumstances, the muddled state of the case law warrants inspection, distinction and clarification, beginning with the Tenth Circuit case of *Amarex.*

In *Amarex*, general counsel of Amarex ("claimant") sought to classify his $10,000 first-year bonus, which was promised to him in a written pre-petition employment agreement, as an administrative expense. The relevant facts of the case are as follows:

As a condition of accepting employment with Amarex, the claimant demanded that Amarex match his existing salary of approximately $65,000. Amarex was hesitant to do so because certain vice presidents of the company were compensated at that level. The written employment agreement therefore provided that the claimant was entitled to a base salary of $55,000 per year and a "guaranteed annualized bonus" of $10,000 in the first year of employment, which could be advanced to the employee on a monthly basis upon request, ostensibly to offset the interest differential between the mortgage on the home he was selling in order to accept the employment and the mortgage on the home to which he was relocating.[1] The written employment agreement satisfied the claimant's demand for compensation of $65,000 by reclassifying $10,000 of it as a "guaranteed annualized bonus." Approximately eight months later, Amarex was involuntarily placed under the supervision of the bankruptcy court. An order for relief and an order permitting Amarex to continue to compensate employees at their

---

1. The claimant did not exercise his right to request his "bonus" in monthly increments, however, and his monthly "bonus" payments accrued over the course of the year.

pre-petition rates were entered. *Id.* at 1527–29, 1531 n. 6.

When the claimant was not paid the $10,000 bonus at the end of his first year, he filed an application for payment of an administrative expense in the amount of $10,000. The bankruptcy court determined that only the portion of the bonus attributable to services performed post-petition was entitled to priority as an administrative expense. On appeal, the district court held that the entire bonus was entitled to priority on the theory that it was "wholly earned post-petition," that is, it was earned at the moment that the employee was employed for an entire year, which occurred post-petition. *Id.* at 1528–29.

The Tenth Circuit Court of Appeals reversed the district court and affirmed the bankruptcy court. The Tenth Circuit held that the $10,000 "bonus" was a component of the claimant's salary in light of the fact that it was to be "annualized" and could be paid through monthly "advances." *Id.* at 1531–32. The Court viewed the "bonus" as earned incrementally throughout the fast year and found that the "bonus" component of the claimant's salary was payable as an administrative expense only for the monthly increments due for services performed post-petition. "Only those services were 'consideration supporting ... the claimant's right to payment ... both supplied to and beneficial to the debtor-in-possession in the operation of the business.' " *Id., citing In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976).

The Movants' circumstances are distinguishable from those in *Amarex.* And while the principles of *Amarex,* especially its reliance upon *Mammoth Mart* case, are applicable here, they do not support the Movants' position.[2]

**2.** The Movants argue that in *Amarex,* the Tenth Circuit adopted the rationale that severance pay is an administrative expense entitled to priority because it is " 'compensation for the hardship which all employees ... suffer when they are terminated and therefore it is "earned" when the employees are dismissed'." *Amarex,* 853 F.2d at 1531, *quoting Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 104 (2d Cir.1986), *and citing Straus–Duparquet, Inc. v. Local Union No. 3,* 386 F.2d 649 (2d Cir.1967). While the Tenth Circuit acknowledged that other courts have so held, it recognized a split among courts and circuits on the issue. *Id.* at 1531 n. 5. These varied severance pay cases did not apply to the issue before the Tenth Circuit, however, because *Amarex* was not a severance pay case; no analysis of the principle was performed by the Tenth Circuit. From the severance pay cases, the Tenth Circuit concluded that "what is crucial is what consideration supports [the claim], and whether such consideration, or portion of it, was pre-petition services." *Id.* at 1531.

Currently, the proposition quoted above is a minority view followed in the Second Circuit, with *McFarlin's* and *Straus–Duparquet* often cited. Not all bankruptcy courts in the Second Circuit agree with the *McFarlin's/Straus–Duparquet* characterization of severance pay, however. *See e.g., In re Jamesway Corp.,* 199 B.R. 836 (Bankr. S.D.N.Y.1996) (refusing to categorize contractual termination pay claims as "severance pay"); *In re Hooker Investments, Inc.,* 145 B.R. 138, 147, 150 (Bankr.S.D.N.Y.1993) (although it has not been expressly overruled, the vitality of *Straus–Duparquet* "must be reconsidered in light of the changes in the governing law and business world and of the rulings of the United States Supreme Court and other courts, including the Second Circuit itself;" the *Straus–Duparquet* rule is not applicable to "high-powered, high-priced executives with individually negotiated contracts providing for substantial termination payments."); *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 711–13 (Bankr.S.D.N.Y.1992) ("A claim for two weeks' pay is different, not just in degree, but in kind, from a claim for three years' salary and bonuses. The fact that a claim for the former was allowed [in *Straus* ] is no authority for allowing the latter.").

A review of the *McFarlin's* case indicates that it too is merely a survey of prior severance pay cases in the Second Circuit which granted priority to such claims. *McFarlin's,* 789 F.2d at 104. And since *McFarlin's* was not a severance pay case, either, but an ERISA withdrawal liability case, its reference to these prior severance pay cases was for the purpose of indicating that those cases were not analogous to a case of ERISA withdrawal liability. *Id.* The *McFarlin's* Court commented that "[t]hese decisions rest on the

██ An examination of the policy served by granting priority to administrative expenses is necessary to evaluate whether a claim is properly classified as an administrative claim. The widely-cited test for determining whether a claim should be afforded administrative priority under Section 503 is gleaned from the *Mammoth Mart* case cited above,[3] which is as follows: the debt must (1) "arise from a transaction with the debtor-in-possession" and (2) be "beneficial to the debtor-in-possession in the operation of the business." *Mammoth Mart,* 536 F.2d at 954. Because bankruptcy law and policy favors equal distribution to all creditors, claims for preferential treatment must be scrutinized with trepidation. "If one claimant is to be preferred over others, the purpose should be clear from the statute.... To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer." *Mammoth Mart,* 536 F.2d at 953, *quoting Nathanson v. NLRB,* 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952).

██ In a chapter 11 proceeding, an operating debtor in possession must be able to *induce* suppliers, employees, vendors, professionals, etc., to do business with the bankrupt entity—an entity that is by definition already financially impaired. The statutory promise that these parties will be paid before those parties who did business with the debtor pre-petition is the inducement. Preferring administrative claimants to pre-petition claimants is fair because post-petition suppliers, employees, etc., are necessary to maintain business operations to allow the debtor in possession to produce operating revenues and hopefully be profitable enough to create a pool of funds for distribution to pre-petition creditors. Likewise, a debtor in possession "is free to terminate unprofitable activities or product lines, to reject burdensome executory contracts, ... and to take all steps necessary to solve the problems created by the debtor's operation of the business in the past." *Id.* at 954.

██ The Court in *Mammoth Mart* applied these principles to determine whether a claim for severance pay was entitled to administrative priority. Ultimately, the determination depended upon whether the consideration supporting the

---

basis that severance pay is compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated and that it is therefore 'earned' when the employees are dismissed." *Id.* In *McFarlin's,* the Second Circuit did not analyze the facts underlying the prior severance pay cases, but merely recited a broad generalization to distinguish severance pay claims from ERISA withdrawal liability.

Significantly to this case, the *Straus–Duparquet* rationale that severance pay is compensation for termination of employment and thus entitled to administrative priority when termination occurs post-petition was *specifically rejected* by the Court in *Mammoth Mart v. Mammoth Mart,* 536 F.2d at 955. In *Amarex,* the Tenth Circuit utilized the test set forth in *Mammoth Mart* and its rationale, and not the rationale of *Straus–Duparquet,* to assess whether the claim in the *Amarex* case should be accorded priority.

The unfortunate conclusory dicta contained in *McFarlin's,* and quoted in *Amarex,* has been regurgitated by the Movants in this case, and by other courts, as if it were black letter law. This Court finds that the Second Circuit cases must be read very carefully to ascertain the statutory and factual underpinning for the conclusion that severance pay claims are entitled to priority. A conclusory statement that severance pay is earned upon termination and thus is entitled to priority is simplistic and ignores the plain language of the statute upon which administrative priority is based.

3. In addition to this Circuit (see *Amarex,* 853 F.2d at 1530), the *Mammoth Mart* test is followed in the First Circuit (*Mammoth Mart*); the Second Circuit (*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98 (2d Cir.1986) (the Second Circuit used the *Mammoth Mart* test to determine the priority of the ERISA withdrawal liability)); the Sixth Circuit (*Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.),* 126 F.3d 811 (6th Cir. 1997)); the Seventh Circuit (*Matter of Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984)); and the Ninth Circuit (*Abercrombie v. Hayden Corp. (In re Abercrombie),* 139 F.3d 755 (9th Cir.1998)).

claim was supplied *to* the debtor in possession and *was beneficial to* the debtor in possession.[4] The *Mammoth Mart* Court gave examples of situations in which severance pay was-and was not-entitled to administrative priority.

In its first example, the Court considered an employment policy established by the *debtor in possession* that provided that all discharged employees would receive severance pay, the amount of which was calculated according to the length of time such employees worked for the debtor in possession. There, the consideration given to the debtor in possession was service to the estate only, and no part of the severance pay was attributable to pre-petition services. The Court concluded that under that scenario, employees thereafter discharged would have severance pay claims entitled to administrative priority. *Id.* at 955. The agreement was with the post-petition entity and the benefit of the agreement (services) was given to the estate.

In a variation of the above example, the Court considered a situation where a debtor in possession *assumed* a pre-petition employment contract containing a severance provision. Upon assumption, the pre-petition contract would become a post-petition contract and would be fully enforceable against the debtor in possession, and claims under such contract, including severance pay claims, would become administrative expenses. *Id.* at 953.

In the second example, the Court considered a debtor in possession, who, in order *to induce* employees to remain on the job, promised severance pay that would be based upon the debtor's pre-petition practice (and presumably the amount of severance pay would be based upon length of pre-petition and post-petition service combined). In such a case, remaining on the job and performing services post-petition would constitute the consideration given to the debtor in possession in exchange for the promise of severance pay. *Id.* at 955 n. 4. Upon termination of an employee, the debtor in possession's promise to pay severance pay to the employee would correctly be classified as an administrative priority claim.

The third example was the set of facts actually before the *Mammoth Mart* Court. The claimants were long-term employees who sought severance pay pursuant to the policy in place prior to the institution of Chapter XI proceedings which provided severance pay of one week's pay for each year of employment.[5] The debtor in possession did not *induce* the employees to stay by promising them severance pay, but simply *permitted* them to continue working after the bankruptcy was filed. The Court determined that the debtor was "bound to pay under the terms of the [pre-petition] debtor's contract *only to the extent that the debtor-in-possession was the recipient of beneficial services.*" *Id.* at 955 n. 4 (emphasis added).

The Court rejected as unpersuasive the syllogism that "since severance pay is compensation for termination of employment and since the employment of (the) claimants was terminated as an incident of

**4.** Attention should be drawn to the distinction between the pre-petition "debtor" and the post-petition "debtor in possession." Upon the filing of the bankruptcy petition, CFS the "debtor" became CFS the "debtor in possession." As debtor in possession, CFS assumed fiduciary duties to the estate and its beneficiaries and was conferred new rights and powers to exercise for the benefit of the estate and its beneficiaries. "The benefit to the estate test limits administrative claims to those where consideration for the claim was received during the post-petition period." *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.),* 126 F.3d 811, 816 (6th Cir.1997).

**5.** It should be noted that in *Mammoth Mart,* the debtor did pay all terminated employees up to four weeks' pay upon severance, but the propriety of the debtor's payment of such severance was not at issue in the case. It appears that the debtor in possession's payment of this limited amount of severance pay was gratuitous rather than required under any pre- or post-petition contract or policy.

the administration of the bankrupt's estate," such claims arose post-petition by action of the debtor in possession and therefore constituted an administrative expense entitled to priority. *Id.* at 955 (rejecting the result and rationale of *Straus–Duparquet, Inc. v. Local No. 3*, 386 F.2d 649 (2d Cir.1967); see footnote 2, *supra*). "It is established that a debt is not entitled to priority as a cost and expense of administration simply because the claimants' right to payment arises after the debtor-in-possession has taken some action. It is only when the debtor-in-possession's actions themselves that is, considered apart from any obligation of the [pre-petition] debtor[,] give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." *Mammoth Mart*, 536 F.2d at 955 (citations omitted). *See also Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757–58 (9th Cir.1998) (time when claim arises is when a commitment by the debtor occurred; if debtor agrees or commits pre-petition, the claim is a pre-petition contingent claim; post-petition removal of the contingency does not render the resulting liability an administrative expense); *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 818–19 (6th Cir.1997) (same); *Matter of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir.1984) (same).

■ Applying the *Mammoth Mart* test to the facts of this case, the Court concludes that the Lump Sum Termination Payment Clauses did *not* arise out of a post-petition agreement between the Movants and CFS as debtor in possession. CFS's liability, albeit contingent, arose pre-petition when CFS entered into agreements with the Movants. The "inducement value" of the Lump Sum Termination Payment Clauses was reaped by CFS pre-petition when CFS successfully induced the Movants to forego other opportunities to join CFS.[6] Although the contingency upon which the Lump Sum Termination Payments became due—the termination of the Movants—occurred post-petition, the claims arose under pre-petition agreements with pre-petition CFS. Therefore, the first prong of the *Mammoth Mart* test, that the claim be pursuant to an agreement with the debtor in possession, has not been met.

The facts in this case are analogous to those in *Mammoth Mart*. Rather than inducing Movants to remain in their positions post-petition, CFS merely *permitted* them to continue working until terminated in connection with a mass layoff. CFS did not enter into any post-petition agreements with the Movants and did not assume the pre-petition agreements. In fact, the pre-petition employment contracts with the Movants were rejected by CFS because CFS, in its business judgment, determined that the Movants' services were *not* necessary to the reorganization effort and that rejection of the contracts containing the Lump Sum Termination Payment Clause was necessary to CFS's cost reduction effort. Therefore, CFS determined that continued service of the Movants would not be beneficial to the estate. Thus, the second prong of the *Mammoth Mart* test—benefit to the debtor in possession—has not been met.

■ To the extent that the Movants performed post-petition services, they were paid the value of their services in full. In *Mammoth Mart*, the Court recognized circumstances wherein apportionment of a severance pay claim into pre-petition and post-petition segments may be appropriate. In such a case, administrative priority may be granted to the extent that consideration was given (*i.e.*, services were

---

6. The employment agreements did not require Movants to invest any period of service in order to be entitled to the Lump Sum Termination Payments. While Movants argue that such payments are "earned" upon termination, the Court finds that the payments were actually "earned" upon execution of the employment agreements.

rendered) to the estate post-petition. *Mammoth Mart,* 536 F.2d at 955. In this case, however, the Lump Sum Termination Payment was not a reward for length of service or for remaining employed; it was an incentive to accept CFS's offer of employment. The right to a Lump Sum Termination Payment vested immediately upon execution of the employment agreement. The Movants' claims are not divisible into pre- and post-petition parts based upon pre-and post-petition consideration tendered to CFS.

Finally, it is noted that Spangler's claim is distinguishable from the Bachman and Phelps claims because Spangler's claim is based upon CFS's failure to comply with the provision of Spangler's contract that obligated CFS to give Spangler six months' notice prior to termination, or in lieu thereof, to pay her the equivalent of six months' salary. The Court is aware of cases that distinguish severance pay based upon length of service from severance pay "in lieu of notice." *See, e.g., In re Jeannette Corp.,* 118 B.R. 327 (Bankr.W.D.Pa. 1990) ("if the right to severance pay is based upon failure to give notice and not based on length of service, it is "earned" when termination occurs and the full amount thereof is entitled to the priority treatment statutorily prescribed for such a period." *Id.* at 330, *citing In re Public Ledger,* 161 F.2d 762, 771 (3d Cir.1947)). The Court finds that the *Jeannette* line of cases suffers from the same infirmity of analysis as the *McFarlin's* line of cases, in that it makes an overbroad statement granting administrative priority to certain claims without clear statutory support. *See* footnote 2, *supra.*

Therefore, the rationale for rejecting Spangler's claim to priority is identical to the rationale applied to the other Movants, notwithstanding the existence of cases that carve out "severance pay in lieu of notice" as a special class of priority claims. CFS's promise to give six months' notice to Spangler upon termination was consideration in part for Spangler's pre-petition agreement to forego other opportunities, relocate to Tulsa, and become employed by CFS. Spangler was not required to remain employed for any period of time in order to be entitled to the Lump Sum Termination Payment. Spangler earned the benefit upon execution of the employment agreement. No benefit was conferred post-petition upon the debtor in possession. Spangler's claim has no indicia of a priority administrative claim under the *Mammoth Mart* test.

■ The Court finds and concludes that the Movants' claims under the Lump Sum Termination Payment Clauses contained in their rejected employment agreements are not administrative expenses entitled to priority.[7] To the extent that the Movants believe they have claims for Lump Sum Termination Payments, they may submit proofs of claim therefor to the extent permitted by 11 U.S.C. § 502(b)(7) as unsecured non-priority claimants at the appropriate time.

The Movants' Motions are therefore **denied.**

---

7. Claims under unassumed executory contracts that are rejected are deemed to accrue immediately prior to the filing date of the petition. *See* 11 U.S.C. § 365(g)(1) ("[T]he rejection of an executory contract ... of the debtor constitutes a breach of such contract ... if such contract ... has not been assumed ..., immediately before the date of the filing of the petition[.]"). Phelps and Bachman ar-

gue that withdrawal of their objections to CFS's motions to approve the rejection of the contracts was contingent upon an agreement that rejection would not affect their right to pursue administrative claims for Lump Sum Termination Payments. Even if the Movants could and did preserve that right, the Lump Sum Termination Payments are not administrative claims under *Mammoth Mart.*