In re VICTORIA HARDWOOD LUMBER COMPANY, INC., Debtor.

VICTORIA HARDWOOD LUMBER COMPANY, et al., Plaintiffs,

v.

HOLT–REFAKIS EQUIPMENT COMPANY, et al., Defendants.

Bankruptcy No. 2–88–02190.
Adv. No. 2–88–0174.

United States Bankruptcy Court,
S.D. Ohio, E.D.

Nov. 7, 1988.

See also, Bkrtcy., 95 B.R. 954.

Richard T. Ricketts, Wesp, Osterkamp & Stratton, Columbus, Ohio, for plaintiff, Victoria Hardwood Lumber Co., Inc.

James H. Gordon, Columbus, Ohio, for defendant, Holt–Refakis Equipment Co.

Richard M. Francis, Bowles, McDavid, Graff & Love, Charleston, W.Va., and James H. Prior, Porter, Wright, Morris & Arthur, Columbus, Ohio, for Cecil I. Walker Machinery Co.

OPINION AND ORDER ON COUNTS I & II OF COMPLAINT, MOTION TO COMPEL ASSUMPTION OR REJECTION OF LEASE AND RENTAL AGREEMENTS AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND FOR ADEQUATE PROTECTION

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court after trial of Counts I and II of this Complaint combined with hearing of related portions of a Motion to Compel Assumption or Rejection of Lease and Rental Agreements and a Motion for Relief from the Automatic Stay and for Adequate Protection (the "Motions"). Holt–Refakis Equipment Company ("Holt–Refakis") is the defendant in this adversary and the movant of the Motions which were filed in the related bankruptcy case of Victoria Hardwood Lumber Company, Inc. ("Victoria"). Victoria is the plaintiff in this adversary and a debtor-in-possession before this Court. Although these matters were consolidated for purposes of trial and hearing with similar matters affecting another creditor of Victoria, this opinion is issued separately for reasons of clarity.

The Court has jurisdiction in these proceedings under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. The Motions and the Complaint,

for which Counts I and II seek a judgment declaring the nature of certain transactions between Victoria and Holt–Refakis, are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(K) & (M) in which this bankruptcy judge may enter final orders.

## I. FINDINGS OF FACT

### A. *The Transactions*

On December 15, 1986, Victoria, through its president Ervin Tackett, executed two sales order contracts for new Caterpillar model 926 wheel loaders with attachments. The negotiated price for each loader was $79,041. Each agreement provided for initial rental periods of twelve months with payments of $1,320 each month. At the conclusion of the rental periods, the unpaid balances of the purchase prices would be financed and the resulting take-out loans would be amortized over a 36–month period. All rental payments were to be applied against the purchase price and no part of such payments was to be treated as interest charges. An allowance of $13,000 also was to be given against the price of each loader as credit for used model 920 Caterpillar wheel loaders traded in by Victoria as part of each transaction.

The new loaders were delivered to Victoria on February 2 and February 25, 1987. On February 9, 1987, Victoria, as lessee executed a Lease and Rental Agreement for each loader for the initial twelve-month period. Neither lease was executed on behalf of Holt–Refakis. At the same time, UCC–1 financing statements were executed in favor of Holt–Refakis and were filed with the offices of the County Recorder of Pike County, Ohio and the Secretary of the State of Ohio.

The new loaders were specifically ordered from Caterpillar, Inc. ("Caterpillar") by Holt–Refakis for Victoria. Certain specified lumber log-fork and clamp attachments for each machine also were ordered for Victoria by Holt–Refakis from Balderson, Inc., which invoiced Holt–Refakis for each fork. Other attachments, including control levers, were ordered by Holt–Refakis from Caterpillar, and those attachments and the loaders were invoiced to Holt–Refakis by Caterpillar. Each loader also carried with it an extension of the power-train warranty from the usual six-month period to a three-year period.

Under the terms of the leases, Victoria agreed, in part, to indemnify Holt–Refakis for any loss or damage to the loaders, to maintain, repair and insure the loaders, and to pay any applicable taxes. Although Holt–Refakis indicated it would refund the trade-in allowance to Victoria if the purchase option were not exercised, no obligation for such refund exists in the written agreements of the parties. Further, Holt–Refakis' sales representative indicated that refund would not be given for the trade-in. It appears that the trade-in credits reduced the monthly rentals.

Between the time the sales order contracts were executed and the leases were executed, Victoria discovered it could purchase the loaders more cheaply from another source. Because Holt–Refakis had ordered the non-Caterpillar attachments to the loaders and had become obligated to Balderson, Inc. however, recission of the agreements would have obligated Victoria to pay approximately $16,000 for the fork attachments.

At the end of the initial rental period Victoria could have returned the loaders without further obligation. Upon payment of the twelve monthly rental charges, however, and after credit for the trade-ins, Victoria had options to purchase each loader for the remaining purchase price of $50,201. It was uncontested that the $50,201 amount was not related to the value of each loader at the time the purchase option is exercised, but to the original negotiated purchase prices amortized over the entire period, less credit for the rental payments and the trade-ins.

### B. *Facts Related to the Transactions Generally*

Holt–Refakis is an Ohio corporation which sells, leases and services Caterpillar equipment through a dealership arrangement. The lease arrangements entered into between Holt–Refakis and its custom-

ers include "straight rentals" and rentals with purchase options. Apparently, the same purchase order form is used initially for a sale, a rental with purchase option, or a straight rental.

Frank Andronis was the salesperson for Holt–Refakis who made the initial contact with Victoria which led to the transactions at issue. As an employee of another company, Andronis previously had sold equipment to Tackett. As a representative of Holt–Refakis, however, Andronis' first discussions with Victoria occurred on December 5, 1986 at which time he and Tackett had preliminary discussions of the list price for the loaders, the various methods of acquiring the machines and the necessity for Holt–Refakis to appraise the used loaders proposed for trade-in. Journalization of those list prices and the twelve-month rental terms were presented to Victoria in writing several days later, although the trade-in values remained uncertain.

As finally set out on the agreement, the negotiated price represented a 15% discount from list for the Caterpillar equipment and a 10% discount from list for the Balderson attachments. The trade-in values were determined by visual inspection of the used equipment and assignment of a trade-in value by Holt–Refakis personnel after review of the visual appraisal report.

There was some dispute as to whether Andronis gave Tackett the exact terms of the 36–month purchase arrangement at the time the initial presentation was made or whether Tackett was given only an indication of financing terms then in use by Holt–Refakis without assurance that such terms would be available at the end of Victoria's initial rental period. Andronis was aware, however, that Victoria intended to purchase the loaders. It is also clear to the Court that both parties believed the twelve-month interest-free rental with a purchase option was an advantageous way for Victoria to finance the required 20% down payment without incurring carrying charges or unduly affecting its cash reserves.

According to Andronis, about 90% of Holt–Refakis' rentals with purchase op-

tions convert to sales after the initial rental period. Although Holt–Refakis does not guarantee that it will provide take-out financing because such determination is dependent upon approval by Caterpillar Financial Services Corp. ("CFSC"), Holt–Refakis works with other institutional sources to assist customers in obtaining financing if CFSC does not give its approval. Upon conversion to full financing from CFSC or another source, the sales contract is assigned and a security agreement is obtained from the customer.

The list price for each loader, exclusive of import or freight charges, was $89,696. Testimony established that depreciation of the types of logging equipment involved may be 25%–30% of the original price over the first year of usage. Although those figures contemplate depreciation from list price, as a practical matter the residual value after the period of depreciation has to be related to the market or discounted price. Therefore, it is fair to assume that an owner or dealer would sell the equipment after one year of usage at approximately a 25%–30% reduction from its original price. That depreciated value for this equipment is $55,000–$59,000. Although Holt–Refakis produced auction records for 926 loaders for 1988 which showed an average sale price of $49,500, there was no showing that the equipment sold by auction was similarly equipped or in similar condition to the loaders leased to Victoria. Further, that value would be a liquidation or quick sale value. Therefore, the Court finds that $55,000–$59,000 is a more realistic value for each loader at the end of the initial term of the Lease. Reduction in value attributable to depreciation would be at a substantially reduced rate for subsequent years. As previously stated, upon exercise of its purchase option, Victoria could have purchased each Loader from Holt–Refakis for the principal sum of $50,-201.

At all times Victoria treated the transactions on its books as capitalized purchases of equipment for which depreciation was taken. Holt–Refakis journalized the corresponding receivable as a rent receivable

and continued to record the loaders in its inventory. Although the status of Victoria's payments is disputed, it is uncontested that at least ten of the twelve payments were made.

### C. *The Inventory Management Assistance Plan*

To assist its dealers in selling equipment, Caterpillar, Inc. ("Caterpillar") instituted an Inventory Management Assistance Plan ("IMAP"). Under the 1987 version of IMAP, as it existed at the time of the Loader transactions, a dealer was permitted to offer its customers initial rental periods up to 12 months with all rental payments applied directly against the purchase price of the equipment upon exercise of the accompanying purchase option. Alternatively a dealer could offer subsidized lower interest rates for a sale financed through Caterpillar's financing entity. Under either such arrangement the dealer's obligation to pay Caterpillar for the equipment arises only upon the earlier of ten days after the customer's exercise of the purchase option, six months from the first "rental" or nine months from the date of invoice from Caterpillar to the dealer. Only a certain portion of a dealer's inventory, determined by a formula from Caterpillar, is eligible for inclusion in the IMAP program.

The IMAP program benefits the customer by permitting a financing of the down payment through an initial rental period, which, in essence, becomes a period without interest if the sale proceeds to conclusion. IMAP also benefits the dealer by permitting it to defer its remittance to Caterpillar.

Changes occurred in the structure of the IMAP program between 1987 and 1988. According to Victoria, Caterpillar's internal communications to its dealers indicated the most significant changes were responses by Caterpillar to certain "false rental" abuses by its dealers. Those changes required a dealer to declare a transaction to be a "sale", thus commencing the dealer's obligation to remit payment to Caterpillar within ten days, where the customer's in-

tent was clearly to purchase the equipment. This directive applied not only to initial sales evidenced by installment sales contracts, but also to "full payout finance leases" evidenced by initial rental periods with options to purchase. If the rental provisions were used, subsidized financing for the takeout period of the subsequent loan to complete the purchase was not available, as only one form of subsidy was available to a customer for a given transaction.

### II. ISSUES OF LAW

By agreement of the parties the issues before the Court at this time are limited as follows:

1. Whether the transactions in question between Holt–Refakis and Victoria are "true leases" or financing (security) arrangements;

2. If the transactions are "true leases", then those issues set forth in Count Two of the Adversary Proceeding shall be considered. Count II seeks a finding that such leases automatically convert to a financing arrangement at the end of the rental period; and

3. If the transactions are "true leases", then the Court will consider those issues raised by the Motions with respect to the timing of Victoria's assumption or rejection of such leases and Holt–Refakis' interest in the property as such relates to the relief from stay motion.

### III. CONCLUSIONS OF LAW

Victoria asserts that its transactions with Holt–Refakis were not true leases, but were financing arrangements for the purchase of the loaders. As support, Victoria argues that the form used by Holt–Refakis was a sales order contract, all or most of the burdens of ownership were upon Victoria, the so-called rentals were just a method of financing the down payments, the loaders and their attachments were specifically ordered for Victoria, and the remaining price to be paid if the purchase options are exercised, when compared with the depreciated value with the equipment, is such that it would be economically unrealistic for Vic-

toria not to exercise its purchase options. Victoria further argues that Holt–Refakis' representative knew Victoria's intent was to purchase the equipment and that such intent is further evidenced by Victoria's accounting of such transactions on its books as capitalized purchases of equipment. Finally, Victoria challenges any characterization of Caterpillar's IMAP program, in which Holt–Refakis participated, as other than a financing device.

In response Holt–Refakis contends that it was never obligated to sell Victoria the equipment and that Victoria was never obligated to buy the loaders. Holt–Refakis further asserts that the same sales order contract form was used for most or all of its transactions with customers and the duties placed upon Victoria by the lease agreements are normal terms, consistent with those found in commercial equipment leases. Holt–Refakis further maintains that the rental payments it received and the trade-in credits represent only the depreciation of the equipment and a margin of profit for its risk. Therefore, according to Holt–Refakis, the remaining price which must be paid if the purchase options were exercised is not such that Victoria is economically compelled to purchase the equipment.

■ The Bankruptcy Code, while it provides for the assumption and rejection of a lease, does not define the term "lease." Section 101(45) of Title 11, United States Code defines a "security interest" as a lien created by an agreement. The legislative history of this section indicates that state or local law should be applied in determining whether a lease constitutes a security interest under the Bankruptcy Code. H.R. No. 95–595, 95th Cong., 1st Sess. at 314 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

Relevant state law is part of the Uniform Commercial Code as adopted in Ohio and codified at Ohio Rev.Code § 1301.01(KK) (UCC–1–201(37)). Section 1301.01(KK) states in pertinent part:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Ohio Rev.Code Ann. § 1301.01(KK) (Anderson Supp.1987).

Although various lists of facts have been set forth by different courts, this Court agrees with the opinion in *Sight and Sound of Ohio, Inc. v. Wright (In re Wright)* that:

The appropriate course to follow is to analyze all the relevant factors surrounding the lease agreement and relationships created therein, in determining if the parties in fact intended to create a security interest. The court finds this approach preferable to adoption of a rigid test or set of criteria because of the fact sensitive nature of the inquiry and the need for a flexible analytical framework that enables the court to analyze the totality of the facts presented.

36 B.R. 885, 890 (S.D. Ohio 1983).

■ The thrust of the statute to determine whether an agreement is a lease or a security agreement is the intent of the parties at the time the agreement was entered into. That issue is primarily factual. *In re Puckett*, 60 B.R. 223, 235 (Bankr.M.D.Tenn.1986), *aff'd*, 838 F.2d 471 (6th Cir. 1988). The intent is to be objectively determined from the facts of the particular case. *Leasing Service Corp. v. Eastern Equipment Co. (In re Eastern Equipment Co.)*, 11 B.R. 732, 736 (Bankr.S.D.W.Va.1981), *vacated on other grounds*, 27 B.R. 980 (S.D.W.Va.1983). If such intent is not clear from testimony of the factual circumstances surrounding the transactions, documentary evidence, or the parties' subsequent treatment of the relationship, such intent can be inferred or presumed from an evaluation of the "lessee's" rights at the end of the lease term. That analysis considers whether the "lessee" is compelled, either under the terms of the lease or by

economic practicality to accept and pay for the property or whether the lessee may just as plausibly return it to the lessor. *Jahn v. M.W. Kellogg Co., Inc. (In re Celeryvale Transport, Inc.),* 822 F.2d 16 (6th Cir.1987); *Alzfan v. Bowers,* 175 Ohio St. 349, 194 N.E.2d 852 (1963).

■ The documentation between the parties is ambiguous as to the relationship created thereby. While Holt–Refakis' usage of a sales order contract form is not significant because such form was apparently used for all types of transactions, it is apparent that the face of the form included items not filled in for straight rental transactions. The degree of detailed information relating to the purchase price, the credit given for the trade-in and the specific terms for the take-out financing are all beyond what is found on the form in a straight rental transaction. The somewhat extended length of the rental period and the presence of the trade-ins at the inception of the rental period also argue for characterization of the transactions as sales. Holt–Refakis' purchase of the equipment, specifically equipped as Victoria requested, further appears more consistent with sales transactions.

On the other hand the purchase price upon exercise of the purchase option is not so low, when compared with the value of the equipment, that Victoria is economically compelled by the price alone to purchase the loaders. Certainly it is in Victoria's best interest, however, to finance the remaining price and retain its "equity" of $5,000–$10,000. Moreover, economic compulsion can be inferred from the fact that Victoria required these or similar loaders to operate its business. Because the only loaders it owned were surrendered to Holt–Refakis as part of these transactions, Victoria would have had to purchase substitute loaders at the end of the rental period if it did not complete the purchases through Holt–Refakis. Since the price for substitute loaders would be significantly higher than the take-out financing price, and Holt–Refakis had no obligation to return the traded-in equipment, as a practical matter, Victoria had no acceptable alternative except to complete the purchase of the loaders.

The Court further finds that the burdens placed upon Victoria by the lease agreements are inconclusive in defining the relationship created. Most commercial leases examined by this Court shift many of the so-called "ownership" burdens to the lessee. In a commercial transaction the Court does not consider such terms necessarily to be indicative of a sale or a lease. Further, it is apparent that the lease agreements give Victoria the right to terminate the arrangements at the end of the lease periods. Those agreements were never executed by Holt–Refakis, however, and the fact of such non-execution appears significant. The lease agreements also appear to make Victoria's purchase options enforceable against Holt–Refakis if the leases are not in default and proper notices are given. Inclusion of the loaders in Holt–Refakis' IMAP inventory also meant that it benefitted Holt–Refakis to characterize the agreements initially as leases.

After analysis of the relevant factors surrounding the sales order contracts and the lease agreements, the Court finds that the totality of the facts presented weigh more heavily toward characterization of these transactions as sales. The Court finds that the parties always intended that Holt–Refakis would sell and Victoria would buy the loaders. The initial "rental periods" were simply no-interest financing of the down-payments through Caterpillar's IMAP program. Practicalities, both economic and operational, made completion of the purchases the only rational alternative for Victoria. Accordingly, the Court finds that the transactions involving the loaders were not true leases, but were financing (security) arrangements.

With that finding, issues 2 and 3 need not be considered by the Court in this proceeding. The parties are directed to request further hearing on Holt–Refakis' Motion for Relief from Stay if such hearing is required.

IT IS SO ORDERED.