In re NATIONWISE AUTOMOTIVE, INC., Debtor.

No. 95–54638.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

July 13, 2000.

Nick V. Cavalieri, Timothy A. Riedel, Arter & Hadden LLP, Columbus, OH, for NW Liquidating, Inc.

Ronald L. Glick, Beth Stern Fleming, Mesirov Gelman Jaffe Cramer & Jamieson LLP, Philadelphia, PA, for IBM Credit Corporation and IBM Corporation.

## MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

This contested matter is before the Court on the objection of NW Liquidating, Inc., formerly known as Nationwise Automotive, Inc. ("Debtor"), to four applications requesting payment of certain administrative expenses.[1] For the reasons that follow, the Debtor's objection is sustained, and all of the applications are denied.

On March 2, 1994, the Debtor entered into a Term Lease Master Agreement ("TLMA") and Term Lease Supplement ("TLS") with IBM Credit Corporation ("IBM Credit"). Pursuant to these agreements, the Debtor acquired 279 sets of computer equipment,[2] to be used as point-of-purchase inventory catalogs in each of its retail stores.[3] On November 16, 1994, the Debtor entered into a Software Licensing Agreement ("SLA") with IBM Corporation ("IBM"). On January 1, 1995, the Debtor and IBM entered into a Maintenance Service Agreement ("MSA"). Both the SLA and M.S.A. § related to the computer equipment acquired by the Debtor under the TLMA and TLS.

On August 18, 1995, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code. The Debtor ceased its retail operations on October 31, 1995. After attempts to reorganize the Debtor as a going concern failed, a plan pursuant to which the Debtor was to be liquidated was filed and confirmed. Nearly all of the computer equipment acquired by the Debtor was returned to IBM Credit in January 1996.

The first application ("Application Number One") was filed by IBM Credit on March 29, 1996, and was amended on April 10, 1996. Application Number One requests payment of amounts due post-petition under the TLMA and the TLS, totaling $363,103.61. The second application ("Application Number Two") was filed by IBM Credit on March 29, 1996, and demands payment of taxes for which the Debtor was financially responsible under the TLMA and TLS, totaling $22,870.64. The third application ("Application Number Three") was filed by IBM on March 29, 1996, and requests payment of amounts due post-petition under the SLA, totaling $49,539.68. The fourth application ("Application Number Four") also was filed by IBM on March 29, 1996, and demands payment of amounts due post-petition under the MSA, totaling $16,093.04.

The Debtor's objection to the Applications was filed on June 10, 1996, and the Debtor asserts that Applications Numbers One and Two should be denied on the ground that the TLMA and TLS did not constitute a lease, but rather a financing arrangement for the purchase of the computer equipment. As to Applications Numbers Three and Four, the Debtor argues that the SLA and M.S.A. § were deemed rejected by the confirmed plan, and that these agreements provided no

---

1. IBM Corporation also has filed a proof of claim. This proof of claim, however, was not addressed in the Debtor's objection, and will not be discussed in this memorandum opinion and order.

2. These sets consisted of a PS2 central processing unit, a color monitor, a CRT, and an impact printer.

3. While a going concern, the Debtor owned and operated a chain of retail motor vehicle parts stores.

benefit to the estate after October 31, 1995, when the Debtor ceased its retail operations. Neither IBM nor IBM Credit filed a response to the Debtor's objection.

At a hearing convened on December 15, 1999, IBM Credit argued that the TLMA and TLS should be construed as a lease, not a financing arrangement. Counsel for IBM and IBM Credit also argued, however, that because the Debtor's objection did not refer to IBM as the applicant with respect to Applications Numbers Three and Four, those applications were not before the Court. The Court disagrees. The objection clearly refers to four applications, and describes the total payments requested in each, as well as the agreements upon which each of the applications was based. Copies of the TLMA, TLS, M.S.A. § and SLA were attached to the objection. Although the objection does refer only to IBM Credit as the holder of the Applications, the Court considers that fact insignificant and will proceed to address the merits of all four Applications.

The allowance of administrative expenses is governed by section 503,[4] which provides, in pertinent part:

(b) After notice and a hearing, there shall be allowed administrative expenses, ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate ....

Administrative expenses are afforded first priority upon distribution of assets of the estate, whether upon liquidation or pursuant to a plan of reorganization. 11 U.S.C. § 507(a)(1).

■ An obligation qualifies as an "actual, necessary" administrative expense only if: (1) it arose from a transaction with the bankruptcy estate, and (2) it directly and substantially benefitted the estate. *In re Sunarhauserman, Inc.*, 126 F.3d 811, 816 (6th Cir.1997); *In re Economy Lodging Systems, Inc.*, 234 B.R. 691, 697 (6th

Cir. BAP 1999). "It is an absolute requirement for administrative expense priority that the liability at issue arise postpetition." *Sunarhauserman*, 126 F.3d at 817. "[T]he proper standard for determining [a] claim's administrative priority looks to when the acts giving rise to [the] liability took place, not when they accrued." *Sunarhauserman*, 126 F.3d at 818. The burden of proving that an expense is entitled to administrative priority initially lies with the applicant. *In re Hanna*, 168 B.R. 386, 388 (9th Cir. BAP 1994). If the applicant satisfies its burden with a preponderance of the evidence, the burden then shifts to the party objecting to the application. *In re Bellman Farms, Inc.*, 140 B.R. 986, 995 (Bankr.D.S.D.1991).

■ Application Number One requests payment of amounts, including late fees, allegedly due from September 1, 1995, through December 31, 1995, under the terms of the TLMA and TLS. In addition, Application Number One also seeks payment of the fair market value of equipment the Debtor failed to return to IBM Credit. The Debtor and IBM Credit have agreed that Ohio law controls whether a lease or a purchase is involved, and both parties cite to Ohio Revised Code section 1301.01(KK)(2), which requires the Court to consider the following factors:

(1) whether the obligation created by the agreement is subject to termination by the obligor;

(2) whether the original term of the agreement is equal to or greater than the remaining economic life of the goods;

(3) whether the obligor is bound to become the owner of the goods; and

(4) whether the obligor has the option to become owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the terms of the agreement.

**4.** Unless otherwise noted, all statutory citations will refer to title 11 of the United States Code, aka the Bankruptcy Code, and all citations to rules of procedure will refer to the Federal Rules of Bankruptcy Procedure.

**904**

The Court will consider these factors in turn.

Paragraph eight of the TLMA contains the following language regarding the Debtor's ability to terminate that agreement prior to its natural expiration:

> Lessee's obligation to pay shall be absolute and unconditional and shall not be subject to any delay, reduction, set off, defenses, counterclaim or recoupment for any reason whatsoever, including any failure of the Equipment, programming or licensed program materials or any representations by IBM. If the Equipment, programming or licensed program materials are unsatisfactory for any reason, Lessee shall make any claim solely against IBM and shall, nevertheless, pay Lessor all amounts payable under the Lease.

The TLMA then contains a handwritten notation that directs the reader to an addendum to the TLS, which provides as follows:

> If Lessee, in good faith, determines that an item of Equipment designated below is excess to its need, Lessee may terminate the Lease for the Equipment provided that:
>
> a) no event of default shall have occurred and be continuing;
>
> b) at least 24 monthly rents have become due and have been paid;
>
> c) Lessee has provided Lessor with 3 months prior written notice of its intent to terminate;
>
> d) Lessee pays Lessor all amounts due and payable to the date of termination, plus a termination charge and any taxes, charges and fees which arise on or before the date of termination;
>
> e) Lessee pays a termination charge on the date of termination for the Equipment equal to the Unit Purchase Price paid by Lessor and specified in the Supplement multiplied by the appropriate Termination Percent
>
> . . . .

The Court must note that this Addendum does not appear to have been executed by IBM Credit. Although the parties did not address this issue, the Court finds it significant, because the TLMA provides that the agreement became "effective when signed by both parties." Thus, it would appear that pursuant to the TLMA, the Addendum regarding termination never became binding. At least one court has considered a lessor's failure to execute agreements regarding the ability of the lessee to terminate that agreement indicative of a financing arrangement rather than a lease. *In re Victoria Hardwood Lumber Co.*, 95 B.R. 947, 953 (Bankr. S.D.Ohio 1988). As the Addendum appears never to have become effective, the TLMA afforded the Debtor no right whatsoever to terminate its obligations to IBM Credit, and it appears that the TLMA and TLS should be construed as an unsecured installment purchase contract rather than a lease.

Even assuming the Addendum became binding, the Court finds that its termination provisions were so onerous as to negate any meaningful right of termination. Termination could only take place twenty-four months into the thirty-six-month term of the TLMA and TLS, and only if the Debtor was current on all of its other obligations. The Debtor was obligated to provide three months notice, and would have had to pay termination charges and other fees to IBM Credit. According to the testimony of David Karchere, a witness called by IBM Credit, had the Debtor exercised its right to terminate after twenty-four months, it would have cost the Debtor no less than $606,313.00. The termination provisions weigh in favor of a finding that the TLMA and TLS constitute an installment purchase contract rather than a lease.

Where the term of the agreement consumes the majority of the useful life of the goods in question, that agreement resembles a purchase contract or financing arrangement rather than a lease. *In re*

*Beker Indus. Corp.*, 69 B.R. 937, 943 (Bankr.S.D.N.Y.1987). According to the testimony of Stephen Florkoski, a thirty-year employee of IBM Credit who currently works for a sub-group responsible for remarketing end-of-lease assets and other returned assets of IBM Credit, the life span of computer equipment in the early '90s was a great deal longer than it is today. He testified that IBM Credit was committed to retaining trained service personnel, manufacturing or being able to obtain spare parts and whatever else was necessary to keep the equipment serviceable for a period of 18–24 months. He further testified that the equipment returned by the Debtor to IBM Credit was in use today, although he did not have knowledge of the location of the equipment in question or the capacity in which such equipment would typically be used now, at least six years after its manufacture. Mr. Florkoski concluded that the useful or economic life of the equipment would not have been consumed by the thirty-six-month term of the TLMA and TLS.

The Court, however, does not find this testimony persuasive. Once the equipment was returned, IBM Credit sold it during 1996 for a total average of only 16.12% of its original value. That amount of depreciation in the fair market value of the equipment, only two years after it was originally purchased, weighs heavily in favor of a finding that its useful life was nearly completely consumed after just twenty-four months. Further, Mr. Florkoski's testimony indicated that even IBM Credit assumed that the technology represented by this equipment only would remain viable for a maximum of two years. Finally, the Court was presented no evidence as to the current use of the equipment, such as to whom it was sold and for what intended purpose. So, while the equipment may have had some discernable use upon expiration of the TLMA and TLS, the overwhelming majority of its useful life would have been consumed. This conclusion weighs in favor of a finding that the TLMA and TLS should be construed as an installment purchase agreement, not a lease.

Pursuant to paragraph eighteen of the TLMA, the Debtor had the right (assuming it was not in default) to purchase the equipment at any time on or after the second anniversary of the agreement, upon three months notice to IBM Credit. The TLS provided that the purchase price would be the "fair market sales value as determined by IBM Credit." The sole exception to this provision were the CRTs, which the Debtor could purchase for $1.00 each. According to the Debtor's Exhibit 2, as explained by Mr. Karchere during cross-examination, IBM Credit calculated the fair market value of the equipment once it was returned. The total fair market value of the equipment, as determined by IBM Credit in 1996, was $449,749.00.[5] The Court assumes this value would have decreased further over the final year of the TLMA and TLS. This is significantly in excess of the actual price realized when the returned equipment was sold over the course of 1996.[6] The Court notes that the fair market value of the equipment as calculated by IBM Credit represents approxi-

---

5. The Court arrived at this calculation as follows: the Debtor acquired 279 printers, displays and PS2 central processing units; and 280 CRTs. IBM Credit valued printers at $125.00 each, displays at $300.00 each, and PS2s at $1,186.00 each. CRTs were valued at $1.00. Multiplying the price per unit by the number of units acquired by the Debtor, the total value of the printers was $34,875.00; the total value of the displays was $83,700.00; and the total value of the PS2s was $330,-894.00. The 280 CRTs were valued at $280.00.

6. According to the Debtor's Exhibit 3, printers were sold at an average price of $121.15, displays were sold for an average price of $6.81, PS2s were sold for an average price of $1,119.97, and CRTs were sold for an average price of $8.51. Had the Debtor returned all of the equipment, and assuming all of it had been sold, IBM Credit would have received a total of approximately $350,555.27.

mately 20% of the original purchase price of $2,176,918.00.

The Court finds that the $1.00 price ascribed to the CRTs constitutes nominal consideration. *See, In re Fox*, 229 B.R. 160, 165 (Bankr.N.D.Ohio 1998) (holding that purchase price of $1.00 constituted nominal consideration for purposes of determining whether an agreement constituted a lease or a security agreement, and finding the agreement to have been the latter). The Court finds the purchase price of the other equipment nominal as well. *See, In re Royal Food Mkts., Inc.*, 121 B.R. 913, 915–16 (Bankr.S.D.Fla.1990)(holding that a purchase price of less than 25% of original value constitutes nominal consideration for the purpose of determining whether an agreement is a lease or a security agreement). The value of the equipment, as calculated by IBM Credit and as realized through the sale of the equipment, had decreased to a fraction of its original value, just two years after the inception of the agreements between the Debtor and IBM Credit. Further, by purchasing the equipment, the Debtor would recognize further savings by not having to incur the cost of returning the equipment to IBM Credit, purchasing or leasing new equipment, and training its employees to use any new equipment. When all of these factors are considered, it is clear the Debtor had little choice but to carry the TLMA and TLS to their conclusion and purchase the equipment.

In sum, the Court holds that the TLMA and TLS should be construed as an unsecured installment purchase contract rather than a lease. The Debtor had no meaningful right to terminate the agreement, the term of which consumed nearly all of the useful life of the equipment. Further, the consideration to be paid by the Debtor in the exercise of its right to purchase the equipment was nominal when compared to the original value of the equipment and the costs associated with returning the equipment to IBM Credit and procuring new equipment. These costs economically compelled the Debtor to become the owner of the equipment. As the TLMA and TLS constitute an unsecured installment purchase contract rather than a lease, and because this pre-petition agreement did not substantially benefit the bankruptcy estate, the Debtor's objection is sustained and Application Number One is **DENIED**.

■ Application Number Two requests payment of taxes assessed against the equipment, from September 1, 1995, through March 31, 1996, totaling $22,-870.64. Pursuant to paragraph twenty-seven of the TLMA, the Debtor was obligated to reimburse IBM Credit for its payment of these taxes on the Debtor's behalf. According to Mr. Karchere's testimony, upon receiving a monthly bill from the taxing authorities, IBM Credit simultaneously paid the taxes and billed the Debtor.

It is undisputed that the contract pursuant to which the Debtor's obligation to reimburse IBM Credit for taxes arose was one entered into pre-petition. IBM Credit presented no evidence as to any direct and substantial benefit received by the bankruptcy estate through the Debtor's having incurred this pre-petition obligation. The Court finds IBM Credit has not satisfied its burden of proving entitlement to administrative expense priority as to Application Number Two. Accordingly, Application Number Two is **DENIED**.

■ Application Number Three demands payment of monthly billings relating to the SLA for November and December 1995 and for late fees allegedly due under that agreement for November 1995 through February 1996. Application Number Three totals $49,539.68. Application Number Four requests payment of monthly billings under the M.S.A. § for November and December 1995 and late fees allegedly due under that agreement from November 1995 through February 1996. The Debtor objects to IBM's demand for administrative priority for these

debts on the grounds IBM has not met its burden of proving its entitlement to administrative priority by having failed to put on any evidence whatsoever as to these applications, arguing instead they are not before the Court. With no evidence from IBM, the Court has no choice but to agree.

Both the SLA and M.S.A. § were executed pre-petition. Further, the Court received no evidence to suggest the Debtor took action to induce IBM to continue to provide services under either agreement after the commencement of the bankruptcy case, or that the bankruptcy estate received a direct and substantial benefit as a result of any post-petition action taken by IBM pursuant to these agreements. Indeed, the Court received no evidence whatsoever that IBM in fact took action under these agreements post-petition. The law on this issue is clearly established. Where the acts giving rise to a liability arose pre-petition, and where the bankruptcy estate received no direct and substantial benefit from the debt in question, such debt is not entitled to administrative expense priority. *In re Unitcast, Inc.*, 219 B.R. 741, 746 (6th Cir. BAP 1998).

In sum, the TLMA and TLS constitute an unsecured installment purchase agreement rather than a lease. As the bankruptcy estate realized no direct and substantial benefit from this pre-petition obligation, IBM Credit is not entitled to administrative priority in its payment. The same result is reached in analyzing the other pending applications.

Accordingly, the Debtor's objection to the applications of IBM and IBM Credit requesting payment of administrative expenses is sustained. The applications are **DENIED**.

**IT IS SO ORDERED.**