**In re PUGH SHOWS, INC., Debtor.**

No. 01–54446.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

March 12, 2004.

David M. Whittaker, Luper, Neidenthal & Logan, LPA, Columbus, OH, Kenneth M. Richards, Matthew Fisher, Columbus, OH, for Debtor.

Donald M. Robiner, Columbus, OH, U.S. Trustee.

Alexander G. Barkan, Columbus, OH, Assistant U.S. Trustee.

Myron N. Terlecky, Susan L. Rhiel, Columbus, OH, for Official Committee of Unsecured Creditor.

## ORDER DENYING THE APPLICATION OF THE FARMERS STATE BANK FOR THE ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM

CHARLES M. CALDWELL, Bankruptcy Judge.

In this Order the Court has addressed the Application of the Farmers State Bank for the Allowance and Payment of an Administrative Expense Claim ("Farmers"). Objections have been filed by Pugh Shows, Inc. ("Debtor"), the Internal Revenue Service and Belmont National Bank. The Court has concluded that the Application should be denied. The pleadings raise issues that have been previously litigated before this Court and the Sixth Circuit Bankruptcy Appellate Panel. As a result, relevant portions of the history of this case and the dispute between the parties are discussed to provide a context for the instant ruling.

Pugh Shows, Inc. ("Debtor") was engaged in the carnival business throughout the northern and southern parts of the United States for several years. It was owned, controlled and operated by Jeffrey D. Pugh ("Mr. Pugh") and members of his family. This carnival business involved the provision of rides, food and beverage services for fairs and festivals, and the Debtor moved between the north and the south corresponding with the seasons.

On April 19, 2001, a voluntary petition for reorganization under chapter 11 of the

United States Bankruptcy Code ("Code") was filed on behalf of the Debtor. From the beginning, this case was unusual in terms of the role of management, and their accounting and cash management practices. These factors presented unique case administration challenges and problems for the Court and the parties. The following events are illustrative.

One day prior to filing on April 18, 2001, Mr. Pugh on behalf of the Debtor entered into a Management/Consultant Agreement to employ Clyde C. Hardesty as the Chief Operating Officer of the Debtor. Subsequently, on July 31, 2001, an Order Authorizing the Debtor–In–Possession to Employ Clyde C. Hardesty as Chief Operating Officer was entered. In this Order the Debtor was authorized to retain Mr. Hardesty for a twelve-month period to provide, "...the Debtor with assistance in restructuring the Debtor's financial affairs, developing a business plan, conducting negotiations with creditors, overseeing the Debtor's relationships with legal counsel and its accountant, negotiating the sale of equipment and other assets with Court approval and *developing management and internal controls for the Debtor.*"... (emphasis supplied).

On August 2, 2001, a mere two days after this Court approved the retention of Mr. Hardesty, the Official Unsecured Creditors' Committee moved to retain Jefferson Wells International ("JWI") as its financial consultant. In support of the Application, in relevant part, it was stated:

The Committee desires to retain and employ JWI as a financial consultant *due to issues that exist regarding the Debtor's cash controls.* Since the Petition Date, the Committee has been concerned regarding the Debtor's procedures for cash control at its various carnival sites. *The members of the Committee are familiar with the Debt-*

*or's prepetition procedures and are concerned that those procedures, which involve receipt of virtually all revenue in cash and payment of virtually all bills in cash, have continued since the Petition Date in this case.* (emphasis supplied).

Subsequently, on August 8, 2001, an Agreed Order Approving the Employment of Jefferson Wells International was entered. JWI was required to submit by August 27, 2001, a report regarding the Debtor's cash management practices. The Report filed by JWI on August 27, 2001, which confirmed the concerns of the Committee and recommended substantial changes, resulted in the entry of an Agreed Order Establishing Cash Management Procedures on September 26, 2001. This Agreed Order, except for a limited number of items, required expenditures to be by check, in addition to establishing other cash management procedures.

All of these actions were taken by the Court to address the management deficiencies and the inability of Mr. Pugh to adapt to his post petition role as a fiduciary. Unfortunately, these efforts proved fruitless, and approximately one month later on November 2, 2001, the Court entered an Order Modifying Debtor's Authority to Operate and Appointing Jefferson Well International to Exercise Certain Authority of the Debtor–In–Possession.

In relevant part the Order stated:

*...(T)he Court finds that the Debtor's management has failed to comply with the terms of the Agreed Order Establishing Cash Management Procedures...* The Court further finds that there is an inability or unwillingness on the part of current management ... to act as a fiduciary for all creditors of the estate. Finally, the Court also finds that there is an apparent conflict of interest in that

Jeffrey D. Pugh testified that he had an interest in acquiring certain assets of the Debtor. (emphasis supplied).

Further the Order delineated the powers of JWI in relevant part as follows:

JWI acting as Agent shall assume all Debtor–in–Possession rights an responsibilities over funds of the estate...JWI ... shall assume all Debtor–in–Possession management authority and will direct the duties of all officers, agents, and employees, including insiders and Pugh family members...*JWI ... shall assume all of the authority of the Debtor-in–Possession to make, establish, discontinue, or modify any and all contractual relationships, including those with third parties,...* (emphasis supplied).

After these events, the parties' efforts became focused on salvaging some value through the winding down of operations and the marshaling and orderly liquidation of the Debtor's assets. In order to gather the assets on December 13, 2001, a Complaint to Avoid and Recover Preferential Transfers, Fraudulent Transfers, and Post–Petition Transfers, to Compel Turnover of Property of the Estate and for Injunctive and Declaratory Relief ("Complaint") was filed. The Debtor was seeking a recovery from several Defendants, including Mr. Pugh and members of his family, and other carnival operators.

The Debtor sought to collect alleged preferential payments, fraudulent transfers, and unauthorized post petition transfers. Also, in the Complaint the Debtor sought an accounting, the turnover of alleged estate property, and a declaration of the Debtor's ownership interests. Finally, the Debtor requested injunctive relief to prevent any further alleged transfers or dispositions of property, and the negotiation of contracts with parties subject to fair and carnival agreements with the Debtor.

Also, on December 13, 2001, a Motion for Temporary Restraining Order and Preliminary Injunction was filed on behalf of the Debtor. It was asserted that one or more of the Defendants had engaged in efforts to remove assets, and negotiate contracts with parties subject to agreements with the Debtor to conduct fairs and carnivals. On December 14, 2001, an Agreed Temporary Restraining Order was entered, and then it was extended until January 14, 2002. On January 11, 2002, an Order Granting Preliminary Injunction was entered, with a trial on the merits of the Complaint set for January 31, 2002.

In order to commence the orderly liquidation of assets, on January 2, 2002, a Motion to Sell Assets Outside the Ordinary Course of Business was filed on behalf of the Debtor. The Debtor sought the approval of the sale of equipment, games and rides, and the Debtor's real property in Lancaster, Ohio. This Motion was amended on January 10, 2002, to preserve certain interests of Belmont National Bank in the sale of the real property. In response, on January 18, 2002, a Limited Objection was filed on behalf of David D. Shives and Shives Concessions, Ltd. and Farmers. It was asserted that certain assets were not property of the estate, or were subject to their lien rights.

On January 31, 2002, the Court was prepared to conduct a trial on the Complaint. At the beginning of the hearing, however, the Court was informed that agreements had been reached on certain equipment and rides, and that a judicial determination would only be required regarding a limited number of items. Two of the rides that remained at issue were the 1991 Wipeout and 1994 Kamikaze. According to Mr. David D. Shives, the Chief Executive Officer for Farmers ("Mr.

Shives"), these rides are very large, and are considered to be "major spectaculars" in the carnival business. For these items the parties required a judicial determination whether they constituted property of the estate, and if so, whether they were subject to the alleged liens of Farmers.

At this hearing the Court received testimony from Messrs. Shives and Pugh. It was at this point that the Court learned that a significant post petition financial transaction had occurred between Farmers and Mr. Pugh, after his removal as debtor-in-possession, and without prior court authorization. In order not to delay the sale of the property that was scheduled for auction in Florida and Ohio on February 12, 2002, and February 19, 2002, respectively, the Court issued an oral ruling. This oral ruling was incorporated by reference in an Order Determining Ownership of the Kamikaze and Wipe–Out Rides and Avoiding Lien entered on February 8, 2002.

The oral findings of fact expressed on the record are as follows:

*On January 3rd, 2000, a bill of sale was executed for the sale of a 1994 Kamikaze and 1991 Wipeout by Bernweg Industries, Incorporated to Pugh Shows, Incorporated for the price of $350,000.* The bill of sale was executed by James K. Wegerly, president of Bernweg Industries, as seller, and by Carl H. Davis, chief financial officer of Pugh Shows, Incorporated, as buyer. The document was witnessed by a Sandra Brown, an employee of Pugh Shows, Incorporated.

...(Four) days later on January 7th 2000, a loan agreement in the amount of $350,118 was executed *between Jeffrey Pugh and Farmers State Bank.* Also on January 7th, 2000 a security agreement was executed *between Jeffrey Pugh and Farmers State Bank.*

The property that was the subject of the above-described bill of sale was purported to be the collateral, along with other equipment. On January 7th, 2000, Farmers State Bank issued a cashier's check in the amount of $325,000, payable to Bernweg Industries.

Also on January 7th, 2000, Farmers State Bank issued a cashier's check to Pugh Shows, Incorporated in the amount of $25,000. David Shives, the president of Farmers State Bank, and Jeffrey Pugh, a primary shareholder and chief executive officer, at the time, of Pugh shows, could not provide any explanation for the discrepancy between the bill of sale price and the sum paid to Bernweg Industries or, otherwise, explain the disposition of the $25,000 cashier's check.

On January 11th, 2000, a financing statement was filed with the Fairfield County Recorder. Also on January 12th, 2000, a financing statement was filed with the Ohio Secretary of State. *Both statements list Jeffrey Pugh as the Debtor and Farmers State Bank as the secured party. Both statements reference equipment other than that covered by the January 3rd, 2000 bill of sale.*

On April 19, 2001 a voluntary Chapter 11 petition was filed on behalf of Pugh Shows, Incorporated. Jeffrey Pugh is a primary shareholder and chief operating officer of Pugh Shows, Incorporated.

Approximately three months after the bankruptcy filing, on July 9, 2001, a loan agreement was executed between Matthew Pugh and Farmers State Bank in the amount of $333,273.76. Matthew Pugh is the son of Jeffrey Pugh. The purported collateral, allegedly, was the same equipment subject to the January 7th, 2000 loan and security agreements. *On July 10, 2001, approximately 18 months after the execution of the bill of*

*sale and original loan, a duplicate State of Michigan certificate of title was issued for the 1991 Chance trailer (Wipeout ride). It contains a title assignment by seller to Pugh Shows, Incorporated. It is signed by James Wegerly on behalf of Bernweg Industries, Inc. This document, however, does not bear any record of any lien holder, including Farmers State Bank.*

On July 18, 2001, Farmers State bank issued a loan system credit and debit transaction statement that purported to recognize the transfer of a loan obligation from Jeffrey Pugh to Matthew Pugh.

*On October 25, 2001, approximately 20 months after the execution of the bill of sale, ... (and) original loan, another duplicate State of Michigan certificate of title was issued, but this time for the 1994 Kamikaze trailer (Kamikaze ride). It contained a title assignment by seller to Pugh Shows, Incorporated. It is signed by James Wegerly on behalf of Bernweg Industries. The document, however, does not bear any record of any lien holder, including Farmers State Bank.*

*On November 2, 2001, in lieu of appointment of a Chapter 11 trustee or conversion to Chapter 7, this court entered an order modifying Debtor's authority to operate as debtor-in-possession and appointing Jefferson Wells International to exercise certain authority of the debtor-in-possession. In relevant part, Jefferson Wells was authorized, and I quote, to assume all of the authority of the debtor-in-possession to make, establish, discontinue, or modify any and all contractual relationships.*

*Eighteen days subsequent to the November 2nd order I just read or quoted from and approximately seven months after*

*the ... (instant) Chapter 11 filing was commenced, Jeffrey Pugh, on behalf of Pugh Shows, Incorporated, on November 20th, 2001 executed a loan agreement in the amount of $333,402.76 with Farmers State Bank and an associated, commercial security agreement. These documents purport to assert a lien on the property that was the subject of the January 3rd, 2000 bill of sale and the January 7th, 2000 loan and security agreements.*

*On November 20, 2001, State of Ohio certificates of title were issued for the 1994 Kamikaze and the 1991 Wipeout. These post-petition titles ...were issued in the name of Pugh Shows, Incorporated and purport to notate liens in favor of Farmers State Bank. The record indicates that no motion authorizing the attainment of credit was filed as required pursuant to Section 364 of the United States Bankruptcy Code. Also, the record indicates that no motion to modify or annul the stay was filed to authorize the purported taking of security interests as required by Section 362 of the United States Bankruptcy Code.* (January 31, 2002 Transcript, pages 190–196) (emphasis supplied).

Based on these oral findings of fact read into the record, the following conclusions of law were also read into the record.

Pursuant to Section 541 of the United States Bankruptcy Code, property of the estate includes all legal and equitable interests as of the date of filing. Prior to filing, a bill of sale for the subject ... equipment was issued in the name of Pugh shows, Incorporated.

There is a cashier's check issued by Farmers Bank inexplicably directing $25,000 of the loan proceeds to the Debtor, Pugh Shows, Incorporated. The State of Michigan duplicate certificates of title for the subject equipment contain

title assignments to the Debtor, Pugh Shows, Incorporated. In addition, these duplicate titles indicate that there is no lien on the subject property.

From these factors, the Court concludes that the subject property constitutes property of the estate within the purview and meaning of Section 541 of the United States Bankruptcy Code. The financing statements filed on January 11th and 12th, 2000 listed the Debtor as Jeffrey Pugh and do not appear to even include the subject equipment. The purported lien notated on the titles on November 20th, 2001 are based upon loan and security agreements executed post-petition, and they were executed on behalf of the Debtor by Jeffrey Pugh after he was stripped of that authority by an earlier final order that has not been the subject of any challenge.

*It is the conclusion of the Court that the post-petition execution of the loan and security documents and the issuance of the titles were violative of Sections 364 and 362 of the United States Bankruptcy Code.*

Accordingly, any lien interest of Farmers State Bank as to the Debtor, Pugh Shows, Incorporated, is void, as a matter of law. Accordingly, it is the conclusion of this Court that the subject property is property of this estate, and it is free of any interest . . .(claimed) by Farmers State Bank.

Accordingly, the Debtor, Pugh Shows, Incorporated, is free to sell the subject property free and clear of any . . . (claimed) interest of Farmers State Bank. That is the ruling of the Court. (January 31, 2002, Transcript, pages 196 to 198) (emphasis supplied).

Subsequent to this ruling, the Debtor proceeded with auctions of its rides and equipment conducted on February 12 and 19, 2002. The net proceeds received by the Debtor for the two rides at issue is the sum of $230,175.00. Also, subsequent to the ruling, a Notice of Appeal was filed by Farmers on February 15, 2002. On July 10, 2002, the instant Application of Farmers was filed, and on July 30, 2002, Objections were filed by the Debtor, the Internal Revenue Service, and Belmont National Bank. On September 19, 2002, a Stipulation was filed that allowed Belmont National Bank to hold in escrow the sum of $230,175.00 pending an outcome of Farmer's appeal and a determination on its administrative claim.

On December 6, 2002, this Court's ruling was affirmed by the Bankruptcy Appellate Panel for the Sixth Circuit. In its decision the Bankruptcy Appellate Panel concluded that title to the rides passed to the Debtor when the post petition State of Ohio certificates of title were issued in the name of the Debtor. Also, according to the ruling of the Bankruptcy Appellate Panel, because the liens of Farmers were added to the titles, post petition, its interests were void because no motions were filed seeking prior court authorization under Sections 362 and 364 of the Code. *Pugh Shows, Inc. v. Shives Concessions, Inc., et al. (In re Pugh Shows),* No. 02–8017, at pages 5–10 (6th Cir. BAP 2002).

Subsequent to the determinations of this Court and the Bankruptcy Appellate Panel that its liens were void, Farmers now in the alternative seeks to recover the proceeds on the theory that it is entitled to treatment as an administrative expense claimant, pursuant to Section 503(a) of the Code. According to Farmers, this claim is supported by the conclusion of the Bankruptcy Appellate Panel that the Debtor acquired its property interest on November 20, 2001, the date when the post petition Ohio certificates of titles were issued. It is argued that this post petition acquisition of title, constitutes a benefit to the

estate that would support the granting of an administrative claim to Farmers.

The objecting parties basically respond that the original loan transaction occurred pre petition, that there was no post petition transaction with the estate but rather with Mr. Pugh who was not authorized to act on behalf of the Debtor, and that there was no direct and substantial benefit to the estate. Further, with reference to any benefit to the estate, the Debtor specifically notes that other similar estate assets did not have Ohio certificates of title, but through orders of this Court, the Clerks in Franklin County and Belmont County, Ohio issued certificates of title post petition.

Turning to the merits of the Application, the allowance of administrative expense claims is governed by Section 503(b)(1)(A) of the Code which provides payment for, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions *for services rendered after the commencement of the case.*" (emphasis supplied). Administrative expenses are entitled to a priority in payment over other charges pursuant to Section 507(a)(1) of the Code.

■ Because the general policy of the Code is to provide an equitable distribution to all creditors, the payment of administrative expenses is strictly limited to those charges that actually served to rehabilitate a business through encouraging the provision of necessary goods and services. Such charges ultimately benefit all creditors. *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.*, 127 B.R. 374, 378 (D.N.D.Oh.1991); *The Beneke Company, Inc. v. Economy Lodging Systems, Inc. (In re Economy Lodging Systems, Inc.),* 234 B.R. 691, 697 (6th Cir. BAP 1999). The claimant has the burden of proof by a preponderance of the evidence. *In re Na-*

*tionwise Automotive, Inc.*, 250 B.R. 900, 903 (Bankr.S.D.Oh.2000).

■ The claimant must show that an expense is derived from a transaction with the bankruptcy estate, as opposed to any preceding entity, and that it directly and substantially benefitted the estate. Administrative expense status is only granted for liabilities that arise post petition. *In re Nationwise Automotive*, at 903; *Pension Benefit Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman),* 126 F.3d 811, 817 (6th Cir.1997); *Employee Transfer Corp. v. John T. Grigsby, (In re White Motor Corp.),* 831 F.2d 106, 110 (6th Cir.1987); *In re Cardinal Industries, Inc.,* 142 B.R. 801, 806–807 (Bankr.S.D.Oh. 1992); *In re Cincinnati Cordage and Paper Co.,* 271 B.R. 264, 267 (Bankr.S.D.Oh. 2001).

■ In order to determine whether a transaction occurred pre or post petition, the focus is on, "...when the acts giving rise to a liability took place, not when they accrued." *In re Sunarhauserman,* at 818; *In re Jartran, Inc.,* 732 F.2d 584, 587 (7th Cir.1984). Further, claimants are not entitled to recovery for taking actions that were calculated to protect their interests, rather than those of an estate and all of its creditors. *Wolf Creek Collieries Co. v. GEX Kentucky, Inc.,* at 376–377; *In re Jartran, Inc.,* 71 B.R. 938, 945 (Bankr. N.D.Ill.1987).

■ During the August 14, 2003, hearing Farmers offered testimony in support of its administrative claim in the form of Mr. Shives, its Chief Executive Officer. No corroborating testimony was provided from Mr. Pugh, Mathew Pugh, James Wegerly or any others involved in the transactions. Mr. Shives now recalls that $25,000.00 of the loan proceeds were issued in the form of a cashier's check payable to the Debtor at the direction of Mr.

Pugh. The purpose according to Mr. Shives, was to make repairs to and maintain the rides. Also, Mr. Shives testified that efforts were made for nearly two years to obtain the titles from Bernweg Industries, Inc., "...so we could perfect our security agreement when the titles came from Jim Wegerly, the owner of Bernweg Industries." (August 14, 2003, Transcript, page 43).

According to Mr. Shives, the Michigan certificates of title were not received by Farmers from Bernweg Industries, Inc. until November 18, 2001, and then on November 20, 2001, he and Mr. Pugh traveled together to the courthouse in Lancaster, Ohio to obtain Ohio certificates of title. This action was taken, again according to Mr. Shives because, "...(t)he only way we felt we could get our security agreement perfected at that time was to transfer the loan to Pugh Shows'... name; myself drive personally to Lancaster to the title department, taking Jeff Pugh to the title department; and getting those titles transferred so the bank could have a lien on them." (August 14, 2003, Transcript, page 43).

The essence of the testimony received during the January 31, 2002, hearing and the August 14, 2003, hearing is that the two rides were the subject of a bill of sale dated January 3, 2000, between Bernweg Industries, Inc. and the Debtor, rather than Mr. Pugh personally. On January 7, 2000, however, the related loan and security agreements were executed in the name of Mr. Pugh, rather than that of the Debtor. According to Mr. Pugh's testimony during the January 31, 2002, hearing, the loan and security documents were in his name because he was prohibited by an arrangement with Belmont National Bank from obtaining further loans in the name of the Debtor. (January 31, 2002, Transcript, page 115). The loan proceeds were disbursed in two cashier's checks issued on January 7, 2000–one payable to Bernweg Industries, Inc. ($325,000.00) and one payable to the Debtor ($25,000.00).

Nearly two years after the execution of the bill of sale, the loan and security agreements, and the distribution of the loan proceeds, Farmers finally received from Bernweg Industries, Inc., the Michigan certificates of title. Unfortunately for Farmers, these titles showed a transfer to the Debtor as the purchaser, rather than Mr. Pugh, and most significantly they did not show that any liens were held by Farmers. Again, unfortunately for Farmers, its claimed liens were not included on any certificates of title, until the post petition Ohio certificates of title were issued almost two years after the rides were sold, the loan was closed, and the loan proceeds were disbursed.

Based upon a review of the record, applicable case law and statutory provisions, the Court has concluded for five reasons that Farmers has not established entitlement to payment as an administrative expense claimant. First, contrary to the belief of Farmers, this Court does not find that the exact date the Debtor acquired its property interest is significant for purposes of Farmers' attempt to obtain an administrative priority. Rather, for purposes of this Order all that matters is the demarcation between pre and post petition transactions.

Second, the sale and the initial loan and security agreements were completed and executed on January 3 and 7, 2000, respectively, more than one year prior to the bankruptcy filing on April 10, 2001. It was at this substantially earlier point, that the loan proceeds were disbursed. Third, the loan transaction and security agreements executed between Farmers and in the name of the Debtor on November 20, 2001, occurred approximately seven

months after the bankruptcy filing, and was executed by Mr. Pugh just days after he had been stripped of his contractual authority. No new funds were advanced or disbursed at that time. As found by this Court and as affirmed by the Bankruptcy Appellate Panel, these post petition actions constituted violations of Section 364 of the Code, which requires notice and prior court approval for an extension of secured credit, and Section 362 of the Code, which requires the modification of the stay prior to obtaining a post petition lien.

Fourth, the post petition transactions between Farmers and Mr. Pugh, who illegally purported to represent the interests of the Debtor, were not calculated to in any manner preserve or benefit the estate. No new funds were advanced or disbursed to benefit the estate and all its creditors. Instead, as is revealed by Mr. Shives's own testimony during the August 14, 2003, hearing, the sole purpose was to have Farmers liens placed on the certificates of title for the first time.

Fifth, the allowance of an administrative expense claim under these circumstances would only serve to reward Farmers for its failure to ensure that its loans were properly documented and perfected. It would also reward Farmers for its post petition involvement in actions that were in violation of Sections 362 and 364 of the Code. The estate and its other creditors, who followed the law, should not be required to pay for these errors. Accordingly, the Application of Farmers State Bank for the Allowance and Payment of an Administrative Expense Claim is denied.

**IT IS SO ORDERED.**